SIGA TECHNOLOGIES, INC., Defendant Below, Appellant/Cross Appellee,

v.

PHARMATHENE, INC., Plaintiff Below, Appellee/Cross Appellant.

No. 314, 2012.

Supreme Court of Delaware.

Submitted: March 5, 2013.
Decided: May 24, 2013.

**47.** *Id.* at *3–4.

**48.** *Id.* at *4.

See also 2008 WL 151855, 2010 WL 4813553, 2012 WL 2146000, and 2012 WL 2308180.

Stephen P. Lamb (argued), Meghan M. Dougherty and Laura C. Bower, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Wilmington, Delaware; Andre G. Bouchard, Bouchard Margules & Friedlander, P.A., Wilmington, Delaware; Of Counsel: Walter Rieman and Jaren Elizabeth Janghorbani, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York; Harold P. Weinberger, Jennifer L. Rochon, Seth F. Schinfeld, Kramer Levin Naftalis & Frankel LLP, New York, New York for appellant.

A. Richard Winchester and Christopher A. Selzer, McCarter & English, LLP, Wilmington, Delaware; Of Counsel: Roger R. Crane (argued), Gerald A. Novack, Philip W. Rodgers, Christopher Carton, and Molly Nixon–Graf, K & L Gates, LLP, New York, New York for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

STEELE, Chief Justice:

A Delaware corporation appeals from the Vice Chancellor's finding that it breached a contractual obligation to negotiate in good faith and is liable under the doctrine of promissory estoppel. We reaffirm that where parties agree to negotiate in good faith in accordance with a term sheet, that obligation to negotiate in good

faith is enforceable. Where a trial judge makes a factual finding, supported by the record, that the parties would have reached an agreement but for the defendant's bad faith negotiation, we hold that a trial judge may award expectation damages. We reverse the Vice Chancellor's promissory estoppel holding because a promise expressed in a fully enforceable contract cannot give rise to a promissory estoppel claim. We also reverse the Vice Chancellor's equitable damages award based on his factual conclusion that the parties would have reached an agreement, so that he may reconsider the award in light of this opinion.

## I. FACTUAL AND PROCEDURAL HISTORY[1]

### A. Facts

Plaintiff–Appellee PharmAthene, Inc., and Defendant–Appellant SIGA Technologies, Inc., are both Delaware corporations engaged in biodefense research and development. In 2004, SIGA acquired an antiviral drug for the treatment of smallpox, ST–246. At that time, the drug's viability, potential uses, safety, and efficacy were all unknown, but the drug had enormous potential.

By late 2005, SIGA had experienced difficulty developing the drug and was running out of money. NASDAQ threatened to delist SIGA's shares and SIGA's largest shareholder, MacAndrews & Forbes (MAF), was unwilling to invest additional money. SIGA estimated it needed approximately $16 million to complete the development process.[2]

As a result of SIGA's difficulties, SIGA's management began discussing a possible collaboration with PharmAthene. Thomas Konatich, SIGA's Chief Financial Officer, contacted Eric Richman, PharmAthene's Vice President of Business Development and Strategies. Richman desired a merger between the two companies, but SIGA resisted because of its past experience with PharmAthene.[3] According to Richman's contemporaneous notes, SIGA insisted on framing a license agreement before discussing a merger because of that past experience and because SIGA needed an immediate cash infusion to stabilize its financial situation. By the end of 2005, both SIGA's and PharmAthene's conservative estimates valued ST–246 at approximately $1 billion.

In late 2005 and early 2006, Konatich and Richman outlined the terms of a license agreement. Konatich kept Donald Drapkin, Chairman of SIGA's Board of Directors and MAF's Vice Chairman, well informed about the negotiations.[4] Kona-

---

**1.** The facts in this section are taken primarily from the Vice Chancellor's posttrial opinion below, *PharmAthene, Inc. v. SIGA Techs., Inc. (PharmAthene III)*, 2011 WL 4390726 (Del.Ch. Sept. 22, 2011).

**2.** SIGA also lacked much of the institutional experience necessary to take a drug to market successfully. For example, SIGA lacked employees with expertise in regulatory or government affairs, quality assurance, quality control, clinical trials, manufacturing, and business development.

**3.** Near the end of 2003, SIGA and PharmAthene had discussed a potential merger, but those discussions failed as a result of PharmAthene's board members' reservations.

**4.** Drapkin testified that he had no knowledge of the license agreement and was not involved with the negotiations, but the Vice Chancellor found that the evidence supported the conclusion that Drapkin counseled Konatich about how to proceed in the negotiations. *PharmAthene III*, 2011 WL 4390726, at *3 (citation omitted). The Vice Chancellor relied on evidence that "Drapkin was particularly focused on getting an infusion of cash as soon as possible to fund" ST–246's development and Konatich's credible response "when asked who was running the negotiations for

tich and Richman also assembled negotiation teams on behalf of their companies. On January 3, 2006, Richman sent Konatich and Dr. Dennis Hruby, SIGA's Chief Scientific Officer, a proposed term sheet based on his discussions with SIGA about a license agreement for ST–246. On January 4, Hruby replied: "Thanks for the prompt response. We are most interested in trying to make this a mutually agreeable term sheet and moving on to the next step."

Konatich and Richman continued to exchange draft term sheets. Much of the negotiation focused on upfront cash payments and funding guarantees. On January 16, Richman sent Konatich a revised term sheet that provided for a total deal size of $16 million, an increased upfront payment of $6 million, and significant cash milestone payments. When Konatich forwarded this term sheet to Drapkin, he recommended that Drapkin speak directly to Richman to present SIGA's Board of Directors' position on PharmAthene's proposal.

On January 17, the Vice Chancellor found that Drapkin and Richman discussed the term sheet during a telephone call and Drapkin requested that Richman make two changes.[5] Richman testified that Drapkin told him that if the changes were acceptable to PharmAthene, then "[w]e

have got a deal on the term sheet, and it's ready to present to your board for approval." At a January 18 PharmAthene board meeting, Richman presented the January 16 term sheet and explained Drapkin's proposed changes.[6] Jeffrey Baumel, PharmAthene's outside counsel, drafted the minutes for that board meeting. The term sheet was not signed, however, and the minutes do not state that the board approved the term sheet.[7]

On January 19, Richman again spoke with Drapkin and told him that the PharmAthene board had approved the license agreement term sheet with Drapkin's two proposed changes. While PharmAthene alleges that by this time, the parties had "a deal" and could move on to discussing a merger, Richman did not send a copy of the revised term sheet to Drapkin until February 10, 2006.[8]

On January 26, a clean copy was made of the two-page license agreement term sheet incorporating Drapkin's two changes (the LATS). The LATS recites that the parties intended to "establish a partnership to further develop & commercialize [ST–246] for the treatment of [s]mallpox and orthopox related infections and to develop other orthopox virus therapeutics." The LATS also sets forth terms relating to, among other things, patents covered, licenses, license fees, and royalties. How-

SIGA regarding a license for ST–246" that "'[t]he project—program was being run by Mr. Drapkin and I was his instrument.'" *Id.* (alteration in original) (citations omitted); *see also id.* at *4–5 (discussing Drapkin's involvement).

5. Drapkin did not recall that telephone call and denied telling Richman the parties would have a deal if PharmAthene agreed to two changes. The Vice Chancellor concluded Drapkin's testimony on this point was unreliable based on other witnesses' testimony and the documentary evidence.

6. One of the changes required that SIGA receive 50% of any amounts by which net profits on any U.S. government sales exceeded 20%.

7. The Vice Chancellor found that Baumel credibly testified that the minutes do not mention the term sheet because he does not incorporate documents into the minutes until they are signed.

8. When asked why, Richman explained that Drapkin did not ask for one and that he assumed that Drapkin already had made the changes in his version of the term sheet.

ever, the LATS was not signed, and a footer on both pages states, "Non Binding Terms."

The Vice Chancellor summarized the LATS in his posttrial opinion:

Without attempting to cover all the details, the LATS contemplates a license agreement along the following lines to support the further development and commercialization of ST–246 for the treatment of smallpox. First, SIGA would grant to PharmAthene "a worldwide exclusive license and [sic] under the Patents, Know–How and Materials to use, develop, make, have made, sell, export and import Products in Field. The right to grant sublicenses shall be specifically included in the license." Second, the license would cover ST–246 and all other related products worldwide covered by the patents and know-how relating to ST–246 and its development and manufacture. Third, the LATS described the makeup of a research and development committee, which would include representatives from both PharmAthene and SIGA. The parties identified twelve categories of tasks relevant to that committee and assigned responsibility for each one to either SIGA or PharmAthene. In addition, PharmAthene agreed to fund the research and development based on a defined budget.

Fourth, the LATS included economic terms. PharmAthene was scheduled to pay a "License Fee" of $6 million in total, which consisted of $2 million cash upfront, $2.5 million as a deferred license fee to be paid twelve months after execution of a license agreement if certain events occurred, and $1.5 million after SIGA obtained financing in excess of $15 million. In addition, the LATS contained a provision under which PharmAthene would pay an additional $10

million based on the achievement of specific milestones relating to certain sales targets and regulatory approvals. The LATS also provided for PharmAthene to make annual royalty payments of 8% on "yearly net sales of Patented Products" of less than $250 million, 10% on sales greater than $250 million, and 12% on sales greater than $1 billion. Lastly, the LATS stated that, "[i]n addition, SIGA will be entitled to receive 50% of any amounts by which net margin exceeds 20% on sales to the U.S. Federal Government."[9]

On January 18, 2006, the PharmAthene board decided that it preferred a merger with SIGA instead of a license agreement, so representatives of PharmAthene and SIGA met to begin merger discussions on January 23 at MAF's office in New York City. Because of SIGA's precarious financial position, SIGA asked PharmAthene to provide bridge financing so that SIGA could continue developing ST–246 while merger negotiations proceeded. Richman and two other PharmAthene representatives testified that PharmAthene agreed to consider raising funds for a bridge loan on the condition that PharmAthene would obtain at least a license for ST–246 if merger negotiations fell through.

On February 10, 2006, David Wright, PharmAthene's Chief Financial Officer, sent Drapkin a draft merger term sheet that included the following provision regarding a license agreement:

SIGA and PharmAthene will negotiate the terms of a definitive License Agreement in accordance with the terms set forth in the Term Sheet ... attached on Schedule 1 hereto. The License Agreement will be executed simultaneously with the Definitive [Merger] Agreement and will become effective only upon the

termination of the Definitive [Merger] Agreement.[10]

Drapkin testified that he thought PharmAthene was confused and had no interest in a license agreement. But, the Vice Chancellor found Drapkin undermined that testimony when he admitted "that he understood that PharmAthene wanted to negotiate two documents at once when he received the draft merger term sheet with the license agreement attached."[11]

On February 22, 2006, the parties once again met at MAF's office. Drapkin and another SIGA board member attended. Baumel reiterated PharmAthene's desire to execute simultaneously a merger agreement and a license agreement (in case the merger did not close). Relying on testimony from Baumel, Richman, and Wright, the Vice Chancellor found that Drapkin told PharmAthene he was not going to pay lawyers to draft a formal license agreement and suggested PharmAthene just attach the LATS to the merger agreement. Relying on Baumel's testimony, the Vice Chancellor found that Drapkin told PharmAthene that "this approach would be as good as a license agreement and would guarantee PharmAthene, at a minimum, a license if negotiations for a merger fell through."[12]

The PharmAthene board reviewed a final merger term sheet on March 1, 2006.

That term sheet specifically referred to the LATS and included a copy of the LATS as an exhibit. Again relying on testimony from Baumel, Richman, and Wright, the Vice Chancellor found that during a March 6 meeting, "Drapkin reiterated that 'in any case, if the merger doesn't close, [PharmAthene] will get [its] license.'"[13] On March 10, the parties signed a merger letter of intent and attached the merger term sheet and the LATS.

On March 20, 2006, SIGA and PharmAthene entered into a Bridge Loan Agreement in which PharmAthene loaned SIGA $3 million for expenses relating to the merger, developing ST–246, and overhead. The Bridge Loan Agreement designates New York law as its governing law. It also specifically contemplates that the parties might not ultimately agree on either a merger or a license agreement.[14] Bridge Loan Agreement Section 2.3 obligates the parties to negotiate in good faith a license agreement in accordance with the terms of the LATS if the merger is terminated:

> Upon any termination of the Merger Term Sheet . . . , termination of the Definitive Agreement relating to the Merger, or if a Definitive Agreement is not executed . . . , SIGA and PharmAthene will negotiate in good faith with the intention of executing a definitive License

---

10. *Id.* at \*6 (first alteration and omission in original) (citation omitted).

11. *Id.* (citation omitted).

12. *Id.* (citation omitted). Baumel testified that Drapkin stated that "[i]f the deal doesn't close, we can negotiate a definitive license agreement in accordance with . . . [the LATS] terms and you'll have the license." *Id.* (alterations in original) (citation omitted). Wright also testified that "[a]t one point in this meeting [Drapkin] even instructed Jeff Baumel to put language into the term sheet that would say if the merger didn't happen, then we

would get a license based upon the terms that had already been agreed to." *Id.* (alterations in original) (citation omitted).

13. *Id.* at \*7 (first alteration in original) (citation omitted).

14. Consistent with the idea that the parties might not succeed in negotiating an ongoing relationship, either through a merger or a license agreement, the Bridge Loan Agreement contained a two-year maturity date and granted PharmAthene a security interest in SIGA's intellectual property.

Agreement in accordance with the terms set forth in the License Agreement Term Sheet attached as Exhibit C and [SIGA] agrees for a period of 90 days during which the definitive license agreement is under negotiation, it shall not, directly or indirectly, initiate discussions or engage in negotiations with any corporation, partnership, person or other entity or group concerning any Competing Transaction without the prior written consent of the other party or notice from the other party that it desires to terminate discussions hereunder.[15]

With the Bridge Loan Agreement signed, PharmAthene provided SIGA with financial and administrative support while the parties redevoted attention to their proposed merger terms. On June 8, 2006, PharmAthene and SIGA signed the Merger Agreement, which selects Delaware law as its choice of law. Merger Agreement Section 12.3 is substantively identical to Bridge Loan Agreement Section 2.3 and provides that if the merger is terminated, the parties agree to negotiate in good faith a definitive license agreement in accordance with the LATS's terms. Section 13.3 stipulates that each of the parties must use their "best efforts to take such actions as may be necessary or reasonably requested by the other parties hereto to carry out and consummate the transactions contemplated by this Agreement." Section 12.4 provides that those provisions, among others, survive the Merger Agreement's termination. The Merger Agreement had a dropdead date of September 30, 2006.[16]

The Vice Chancellor found that SIGA's key representatives understood that PharmAthene and SIGA were likely to enter into a lasting relationship, either by a merger or a license agreement. Several comments by SIGA representatives indicate that SIGA began experiencing seller's remorse after SIGA received a $5.4-million-dollar grant from the National Institutes of Health.[17] As the parties continued preparing for the merger, SIGA achieved several milestones. For example, SIGA's Audit Committee approved an agreement with a clinical trial organization to perform the first human trial of ST–246. In September 2006, the National Institutes of Health awarded SIGA $16.5 million to develop the drug. After receiving this grant, SIGA representatives expressed remorse over having agreed to the merger.[18]

15. *PharmAthene III*, 2011 WL 4390726, at *7 (omissions and alterations in original) (citation omitted).

16. PharmAthene's representatives testified that Drapkin, worried about the parties' urgency, explained to them "that he wanted a compressed timeline so that 'everybody will rush. And if we need extensions [SIGA will] grant them.' " *Id.* at *8 (alteration in original) (citation omitted).

17. *See id.* (citations omitted) ("Indeed, even after Hruby was notified of a $5.4 million funding award ..., he still expected the drug to fall under the control of PharmAthene. When Konatich wrote to him that 'it is a damn shame we had to merge,' Hruby responded, 'You got that right.... Had [the former CEO of SIGA] not gotten us behind the curve through ineptitude, we would still be an independent company and standing to make some real dough ... we could have gone all the way ourselves.' " (alterations and omissions in original)).

18. *See id.* at *9 ("For example, after receiving the NIH grant, Hruby stated in an email to Drapkin (which he later acknowledged to be an exaggeration) that, 'I have grave concerns about the merger as it is currently going forward in that the merged company will not be ... [Small Business Innovation Research program] compliant. In that case we would have to shut down [$]30 million in current grants and contracts.' In response to this email, Steven Fasman, an inhouse lawyer at [MAF], asked, 'should SIGA continue with its merger plans or should it try to go it alone?' " (some alterations in original) (footnote omitted)).

As the Merger Agreement's September 30 drop-dead date approached, the SEC still had not approved SIGA's draft proxy statement.[19] PharmAthene asked SIGA to extend the drop-dead date. On October 4, SIGA's Board of Directors met and decided to terminate the Merger Agreement. Shortly after terminating the Merger Agreement, SIGA publicly announced it had received the $16.5 million NIH grant and that ST–246 provided 100% protection against smallpox in a primate trial. After that announcement, SIGA sold two million shares of its stock at $4.54 per share, more than three times SIGA's 2005 share price.

After SIGA terminated the Merger Agreement, PharmAthene hired attorney Elliot Olstein to draft a licensing agreement with SIGA. On October 12, 2006, Baumel sent PharmAthene's Proposed License Agreement to SIGA's outside counsel, James Grayer. On October 26, Olstein emailed Nicholas Coch, another outside attorney for SIGA, and stated that PharmAthene was ready to sign the Proposed License Agreement because it contained "all the essential terms of a license agreement and is completely consistent with the [LATS]." Coch responded that SIGA would not provide a revised license agreement before the parties met, because the "nature of the negotiations required under the Merger Agreement" necessitated "a robust discussion."

Meanwhile, as the Vice Chancellor found, SIGA had internally discussed alternative structures for a definitive license agreement. SIGA's controller emailed Konatich and several other SIGA representatives a financial analysis concluding that total past and future development costs equaled $36.66 million, and that a $40 million upfront license fee would support a 50–50 profit split.

On November 6, the parties met to discuss the license agreement. Given the clinical progress made since the parties last negotiated, PharmAthene emphasized the need to revise some of the LATS's economic terms. PharmAthene's representatives expressed confusion about SIGA's new emphasis on a partnership and maintained that the LATS's terms bound the parties. Nevertheless, PharmAthene was willing to listen to SIGA's proposal in order to avoid a dispute. SIGA then proposed a $40–45 million upfront payment and a 50–50 profit split. SIGA agreed to draft a formal proposal and send it to PharmAthene.

On November 21, 2006, SIGA sent PharmAthene a 102–page Draft LLC Agreement. The Vice Chancellor contrasted the LATS to the Draft LLC Agreement thusly:

> [T]he Draft LLC Agreement included the following economic changes: (1) the upfront payment from PharmAthene to SIGA increased from $6 million to $100 million; (2) the milestone payments to SIGA increased from $10 million to $235 million; (3) the royalty percentages owed to SIGA increased from 8%, 10%, and 12% depending on the amount of sales to 18%, 22%, 25%, and 28%; and (4) SIGA would receive 50% of any remaining profit whereas the LATS provided for profit sharing only from U.S. government sales having a margin of 20% or more. In addition, several non-economic terms were revised to favor SIGA heavily and to undermine PharmAthene's control of ST–246. These provisions included: (1) SIGA's right to resolve disputes unilaterally; (2) SIGA's ability to block any distribution to PharmAthene; (3) PharmAthene's obligation

19. The Vice Chancellor found that both parties had some responsibility for preparing the document and had expected SEC approval before the drop-dead date.

to fund fully the LLC's costs, despite having to split profits 50/50; and (4) SIGA's right to terminate the LLC under certain conditions, with PharmAthene having no right to cure and with all rights to the product reverting to SIGA.[20]

Olstein and Coch exchanged letters discussing SIGA's Draft LLC Agreement throughout November and December. Olstein asserted that the Agreement's terms were "radically different from the terms set forth in the [LATS]," but that PharmAthene was "willing to consider" changes to the LATS, including a 50/50 profit split. SIGA disputed that the LATS was binding because of the "Non Binding Terms" footer, and it never addressed PharmAthene's proposed profit split. Coch issued an ultimatum on December 12: unless PharmAthene responded by December 20 that it was prepared to negotiate "without preconditions" regarding the LATS's binding nature, the parties had "nothing more to talk about." On December 20, 2006, PharmAthene filed suit in the Court of Chancery.

## B. Procedural History

PharmAthene's Complaint contained seven separate counts, asserting claims of breach of contract, promissory estoppel, and unjust enrichment. On January 9, 2007, SIGA moved to dismiss the Complaint for failure to state a claim upon which relief could be granted. After considering the parties' briefing and argument, the Vice Chancellor denied SIGA's motion on January 16, 2008, in *PharmAthene I*.[21]

After extensive discovery, the Vice Chancellor granted PharmAthene's motion to amend its Complaint on May 4, 2009; and PharmAthene filed its Amended Complaint on May 5, 2009. On May 18, 2009, SIGA filed an Answer and Counterclaim. The Counterclaim alleged that PharmAthene breached its contractual obligation to negotiate in good faith and sought dismissal of the Amended Complaint, as well as reliance damages and SIGA's attorneys' fees and costs.

On March 19, 2010, SIGA moved for partial summary judgment under Court of Chancery Rule 56(c), seeking to dismiss Counts One through Four of the Amended Complaint and to preclude PharmAthene from obtaining either specific performance or expectation damages. The parties briefed that motion and the Vice Chancellor heard argument on July 22, 2010. In *PharmAthene II*,[22] the Vice Chancellor denied SIGA's motion in its entirety.

In January 2011, the Vice Chancellor presided over an eleven-day trial in this action. After extensive posttrial briefing, counsel presented their final arguments on April 29, 2011. In *PharmAthene III*,[23] the Vice Chancellor made posttrial findings of fact and conclusions of law on both PharmAthene's Amended Complaint and SIGA's Counterclaim. The Vice Chancellor determined that: (1) Delaware law applied, (2) SIGA was liable for breach of its obligation (under the Bridge Loan and Merger Agreements) to negotiate in good faith a definitive license agreement in accordance with the LATS's terms, (3) SIGA was also liable under the doctrine of prom-

**20.** *PharmAthene III*, 2011 WL 4390726, at *10 (footnote and citations omitted).

**21.** *PharmAthene, Inc. v. SIGA Techs., Inc. (PharmAthene I)*, 2008 WL 151855 (Del.Ch. Jan. 16, 2008).

**22.** *PharmAthene, Inc. v. SIGA Techs., Inc. (PharmAthene II)*, 2010 WL 4813553 (Del.Ch. Nov. 23, 2010).

**23.** *PharmAthene III*, 2011 WL 4390726 (Del. Ch. Sept. 22, 2011).

issory estoppel, and (4) the proper remedy was an equitable payment stream approximating the terms of the license agreement to which he found the parties would ultimately have agreed. The Vice Chancellor also awarded attorneys' fees and costs, relying on statutory authority and contractual provisions in the Bridge Loan Agreement, as well as the bad faith exception to the American Rule.

In *PharmAthene IV*,[24] the Vice Chancellor denied SIGA's motion for reargument. In *PharmAthene V*,[25] the Vice Chancellor issued a letter opinion accompanying his final order and judgment in *PharmAthene VI*.[26] SIGA appeals the Vice Chancellor's orders, and PharmAthene cross-appeals.

## II. STANDARD OF REVIEW

■■■ Different standards of review apply to different portions of this appeal. We review *de novo* the Vice Chancellor's conclusion that Delaware law applies in this action.[27] The Vice Chancellor's conclusions concerning whether a contractual provision requiring parties to negotiate in

good faith is enforceable and whether SIGA is liable under the doctrine of promissory estoppel are legal questions that we review *de novo*.[28] We will uphold his factual conclusions supporting his legal findings as long as they are not clearly erroneous.[29] Concerning the remedy the Vice Chancellor imposed, "[w]hether or not an equitable remedy exists or is applied using the correct standards is an issue of law and reviewed *de novo*,"[30] but "[d]eterminations of fact and application of those facts to the correct legal standards ... are reviewed for an abuse of discretion."[31] We review the Vice Chancellor's interpretation of a contractual fee-shifting provision *de novo*, but we review his decision to award attorneys' fees and costs for an abuse of discretion.[32]

## III. ANALYSIS

### A. Delaware law applies.

■■■ SIGA appeals the Vice Chancellor's ruling in *PharmAthene I* that Delaware law applies to all of the claims in this dispute.[33] Delaware courts analyzing con-

24. *PharmAthene, Inc. v. SIGA Techs., Inc. (PharmAthene IV)*, 2011 WL 6392906 (Del.Ch. Dec. 16, 2011).

25. *PharmAthene, Inc. v. SIGA Techs., Inc. (Pharmathene V)*, 2012 WL 2146000 (Del.Ch. May 31, 2012).

26. *PharmAthene Inc., v. SIGA Techs., Inc. (PharmAthene VI)*, 2012 WL 2308180 (Del.Ch. May 31, 2012) (ORDER).

27. *J.S. Alberici Constr. Co. v. Mid–W. Conveyor Co.*, 750 A.2d 518, 520 n. 2 (Del.2000) (citation omitted); *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1141 (Del.1989) (citation omitted) ("Since it raises a question of law, we review the choice of law claim *de novo*.").

28. *Bank of N.Y. Mellon Trust Co., N.A. v. Liberty Media Corp.*, 29 A.3d 225, 236 (Del. 2011) (citing *Hall v. State*, 14 A.3d 512, 516–17 (Del.2011)).

29. *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1212 (Del.2012) (citing *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 491 (Del. 2000)).

30. *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (citing *Hogg v. Walker*, 622 A.2d 648, 654 (Del.1993); *Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 744 (Del. 1997)).

31. *Id.* (citing *Hogg*, 622 A.2d at 654).

32. *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 675–77, 2013 WL 1914714, at *6 (Del. May 9, 2013) (citations omitted).

33. *PharmAthene I*, 2008 WL 151855, at *8 (Del.Ch. Jan. 16, 2008). SIGA did not waive this argument, as PharmAthene claims, by failing to raise it after the Vice Chancellor decided the issue in his motion to dismiss.

tractual claims apply the "most significant relationship" test of *Restatement (Second) of Conflicts* § 188 in cases where the parties do not specify a choice of law.[34] Where the parties do specify a choice-of-law, Section "187 allows the law of the state chosen by the parties to govern contractual rights and duties unless the chosen state lacks a substantial relationship to the parties or transaction or applying the law of the chosen state will offend a fundamental policy of a state with a material greater interest."[35]

Here, we have two contracts, the Bridge Loan Agreement and the Merger Agreement, which contain competing choice-of-law clauses. Both impose an identical obli-gation to negotiate in good faith. SIGA agrees that, "[c]onsistent with [Section] 187, when two contracts are alleged to have been breached and each contract has a governing law provision designating a different state's law, the Court must determine which contract takes precedence."[36] SIGA argues that the Bridge Loan Agreement should take precedence over the Merger Agreement.

■ A Southern District of New York judge faced a similar question when having to construe two agreements "signed on the same date and for the same purpose."[37] He ultimately read both contracts together[38] to determine which "governed the activity that [lay] at the heart of [the]

See *Robinson v. Meding*, 163 A.2d 272, 275 (Del.1960) (citations omitted) ("Generally, under modern statutes and modern rules, an appeal from a final judgment brings up for review all interlocutory or intermediate orders involving the merits and necessarily affecting the final judgment which were made prior to its entry.").

34. *Travelers Indemn. Co. v. Lake*, 594 A.2d 38, 41 (Del.1991) (citations omitted); *Abry Partners V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1047 n. 23 (Del.Ch.2006) ("Section 188 of the Restatement only applies if the parties have not chosen the law to apply.").

35. *Abry Partners*, 891 A.2d at 1047. SIGA does not argue that either of these exceptions apply.

36. Opening Br. 21. SIGA argues the Bridge Loan Agreement takes precedence. *Id*. Concerning PharmAthene's unjust enrichment claims, SIGA argues *Restatement* § 221 requires that we apply the "most significant relationship" test. *Id*. at 22 (citing *Restatement (Second) of Conflicts of Laws* § 221 & cmt. d (1971)). We note, without deciding, that Section 221 comment d states that "[w]hen the enrichment was received in the course of the performance of a contract between the parties, ... [t]he applicable law will be that chosen by the parties if they have made an effective choice under the circum-stances stated in [Section] 187." *Restatement (Second) of Conflicts of Laws* § 221 cmt. d (1971). Because we hold that SIGA is not liable under a quasicontractual theory, and the only meaningful difference SIGA articulates between Delaware and New York law concerns damages, *see* Opening Br. 22–23, we apply Delaware law and do not reach the issue of whether the contractual choice of law provisions or the "most significant relationship" govern the choice of law analysis on these claims. *See Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del.2010) (citations omitted) ("[T]he result would be the same under both Delaware and Dubai law. Therefore[,] ... there is a false conflict, and the Court should avoid the choice-of-law analysis altogether." (internal quotation marks omitted)).

37. *Elden v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2011 WL 1236141, at *4 (S.D.N.Y. Mar. 30, 2011).

38. While the federal district judge determined that "[u]nder both New York and Ohio law, contracts executed at the same time and for the same purpose are to be read together," *id*. (citation omitted), his rationale is analogous to the present case because the Bridge Loan Agreement and Merger Agreement were negotiated within the same framework and both impose the exact same obligation at issue in this case.

case."[39] Similarly, the Vice Chancellor compared the Bridge Loan Agreement and the Merger Agreement and concluded that the Merger Agreement takes precedence because it was the most recent agreement the parties signed and because the scope of the parties' relationship the Merger Agreement envisioned was broader than the Bridge Loan Agreement. We also note that the Merger Agreement's termination triggered the obligation to negotiate in good faith. Therefore, it is logical that the Merger Agreement's choice of law should control. We affirm the Vice Chancellor's holding because the Merger Agreement occurred later in time and encompassed the activity that lay at the heart of this case. Therefore, we apply Delaware law.

## B. SIGA breached its contractual obligation to negotiate in good faith.

SIGA argues that the Vice Chancellor erred when he concluded that SIGA breached an obligation to negotiate in good faith under the Bridge Loan and Merger Agreements.[40] SIGA argues it is inconsistent to hold that the LATS is not a binding license agreement and at the same time conclude that SIGA's obligation to negotiate in good faith requires that SIGA only propose terms substantially similar to the LATS.[41] We disagree.

■ In *Titan Investment Fund II, LP v. Freedom Mortgage Corp.*, a Superior Court judge held that a letter agreement and term sheet created an enforceable obligation that the parties negotiate a credit facility agreement in good faith.[42] On appeal, we held that the Superior Court judge correctly determined that the defendant breached its obligation, arising from the term sheet and letter agreement, to negotiate in good faith.[43] Although some ambiguity existed concerning whether an obligation to negotiate in good faith was enforceable before *Titan Investment*,[44] we

39. *Id.*

40. SIGA also argues Vice Chancellor erroneously concluded that PharmAthene had not waived this argument below. Opening Br. 14–15. We agree with the Vice Chancellor that "PharmAthene sufficiently preserved its claim ... by making multiple references in its Post[]Trial Opening Brief to SIGA's duty to negotiate in good faith under the Bridge Loan and Merger Agreements." *PharmAthene III*, 2011 WL 4390726, at *19 n. 116 (Del.Ch. Sept. 22, 2011); *see* Plaintiff's Opening Post–Trial Brief at 18, 20, 37, 46 nn. 46–47, 69, *PharmAthene III*, 2011 WL 4390726 (No. 2627). We also agree that while "PharmAthene focused most heavily on its claim that an actual licensing contract existed between it and SIGA," PharmAthene adequately raised its alternative argument that SIGA breached its obligation to negotiate a license agreement in good faith. *PharmAthene III*, 2011 WL 4390726, at *19 n. 116.

41. Opening Br. 16 (citations omitted). SIGA also argues the Vice Chancellor's factual determination that PharmAthene would have accepted terms differing substantially from those the LATS contained implicitly recognizes SIGA's right to negotiate for substantially different terms. *Id.* at 16–17. Finally, SIGA argues that requiring a party to propose terms only substantially similar to a nonbinding term sheet introduces a dangerous uncertainty into our law because a party risks breaching an obligation to negotiate in good faith based on an indefinable amount of variance between its preliminary term sheet and later offer. *Id.* at 17.

42. *Titan Inv. Fund II, LP v. Freedom Mortg. Corp.*, 2012 WL 1415461, at *6–7 (Del.Super. Mar. 27, 2012), *rev'd on other grounds*, 58 A.3d 984 (Del.2012) (ORDER).

43. *Titan Inv. Fund II, LP v. Freedom Mortg. Corp.*, 58 A.3d 984, 2012 WL 6049157, at *3 (Del. Dec. 5, 2012) (ORDER).

44. *See Great–W. Investors LP v. Thomas H. Lee Partners, L.P.*, 2011 WL 284992, at *9 (Del.Ch. Jan. 14, 2011) (citations omitted) ("[A]n agreement to negotiate in good faith *may* be binding under Delaware law, however, and

now reaffirm that an express contractual obligation to negotiate in good faith is binding on the contracting parties.

In *VS & A Communications Partners, L.P. v. Palmer Broadcasting Limited Partnership*, a Chancellor, applying New York law, considered whether a letter detailing a "preliminary understanding," reached in a negotiation to purchase certain television and radio stations, created an obligation to negotiate in good faith.[45] Interpreting New York law, he concluded that "obligations to negotiate are said to be invalid or unenforceable where material aspects of the contract remain open."[46] He concluded that under New York law, "an agreement to negotiate a contract in good faith may be enforced if all the material terms of the contract have been agreed to by the parties."[47] Ultimately he concluded that while the letter created "an express agreement to negotiate in good faith with respect to the details of a price adjustment,"[48] the contract's inferred obligation to continue negotiations on points other than the price adjustment provision was unenforceable because the defendant had "no legal duty to commit itself legally to terms it had earlier negotiated (*e.g.*[,] price) but had expressly not bound itself to legally."[49]

In *Gillenardo v. Connor Broadcasting Delaware Co.*, a Superior Court judge considered a letter of intent setting forth the potential purchase price and other financing and negotiating terms for a sale of two radio stations, including an attached draft of the purchase agreement and related exhibits.[50] The Superior Court judge distinguished *VS & A Communications* "because there the letter of intent had no express provision regarding the duty to work diligently towards completion of a sale agreement[, n]or did it have an express provision requiring good faith attempts to finalize the Sale Agreement."[51]

specific performance could, in theory, be an appropriate remedy for breach of such a provision." (emphasis added)).

45. *VS & A Commc'ns Partners, L.P. v. Palmer Broad. Ltd. P'ship*, 1992 WL 339377, at *7 (Del.Ch. Nov. 16, 1992).

46. *Id.* at *8 (citing *Candid Prods. Inc. v. Int'l Skating Union*, 530 F.Supp. 1330, 1336–37 (S.D.N.Y.1982); *Jillcy Film Enters. Inc. v. Home Box Office, Inc.*, 593 F.Supp. 515, 521 (S.D.N.Y.1984)).

47. *Id.*

48. *Id.* at *9. The price adjustment provision was not at issue in the case. *Id.*

49. *Id.* The Chancellor concluded that "[t]he November 5 letter agreement [did] contain an express agreement to negotiate in good faith with respect to the details of a price adjustment ..., but that provision is not in issue here. As concerns this case, [while] there is no express covenant to continue negotiations," the letter's language "inescapably [contained] an inferential obligation" to continue negotiations for the other provisions. *Id.* The plaintiff interpreted this inferred duty to negotiate as requiring the defendant "to go forward from the points that had been agreed to (albeit in a non-binding fashion) in the ... letter [and] address remaining open issues" and barring both the plaintiff and defendant from going "back to re-open those items agreed upon in that letter." *Id.* The Chancellor held that the plaintiff's interpretation was "a radical interpretation ... that is obviously inconsistent with the characterization of the letter in its first paragraph (a "preliminary understanding") and, more importantly, inconsistent with the express provisions making all of the agreements concerning the substantive terms of the proposed transaction non-binding." *Id.* We distinguish the instant case because here the obligation to negotiate in the LATS is express rather than inferred and that we apply Delaware law, not New York law.

50. *Gillenardo v. Connor Broad. Del. Co.*, 2002 WL 991110, at *1 (Del.Super. Apr. 30, 2002).

51. *Id.* at *7 (citing *VS & A Commc'ns*, 1992 WL 339377, at *4). The Superior Court judge further explained that "the *VS & A* letter of

He also noted that "New York law … may not be consistent with Delaware law regarding the intent of the parties to create good faith duties to negotiate under a letter of intent" [52] because "in Delaware the intention of the parties controls the creation of a good-faith duty to negotiate under a letter of intent." [53] We similarly distinguish *VS & A Communications* from this case.

*RGC International Investors, LDC v. Greka Energy Corp.* [54] is instructive. In *RGC International*, a Vice Chancellor addressed whether a defendant breached an obligation to negotiate a definitive agreement based on a term sheet. [55] The Vice Chancellor noted that the term sheet did "not include language that the parties explicitly reserved the right not to be bound." [56] He concluded that, "[a]t the very least, after signing the [t]erm [s]heet, neither party could in good faith insist on specific terms that directly contradicted a specific provision found in the [t]erm [s]heet." [57]

Similarly, although applying New York law, a Southern District of New York judge concluded that where parties "bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement," [58] a party to that agreement may demand that "his counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms." [59] While "good faith differences in the negotiation of the open issues may prevent a reaching of final contract," a counterparty cannot "insist[ ] on conditions that do not conform to the preliminary agreement." [60]

The express contractual language in the Bridge Loan and Merger Agreements obligated the parties to "negotiate in good faith with the intention of executing a definitive License Agreement in accordance with the terms set forth in the" LATS. The question becomes whether the language "in accordance with the terms set forth" means that the parties had a duty, as the Vice Chancellor found, "to negotiate toward a license agreement with economic terms substantially similar to the terms of the LATS" [61] (or at least not inconsistent with the LATS's terms) or whether the

---

intent implied that there was no such duty because it expressly stated that it '*merely* represents our present understanding with respect to the intended transaction described herein, *and is not binding upon and creates no rights*, express or implied in favor of any party.' There is no such limiting provision in the letter of intent in the instant case." *Id.* (footnote omitted) (citation omitted).

52. *Id.*

53. *Id.* (citing *Anchor Motor Freight v. Ciabattoni*, 716 A.2d 154, 154 (Del.1998)).

54. 2001 WL 984689 (Del.Ch. Aug. 22, 2001), *overruled on other grounds by Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 2013 WL 1914714 (Del.2013).

55. *Id.* at *10.

56. *Id.* at *13 n. 79.

57. *Id.* at *14.

58. *Teachers Ins. & Annuity Ass'n. of Am. v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y. 1987) (citations omitted). Federal courts interpreting New York law recognize this as a Type II preliminary agreement. *See Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*, 519 F.3d 421, 426–27 (8th Cir.2008) (citations omitted).

59. *Teachers*, 670 F.Supp. at 498.

60. *Id.*

61. *PharmAthene III*, 2011 WL 4390726, at *22 (Del.Ch. Sept. 22, 2011).

parties intended the LATS merely as a "jumping off point." [62]

■ Although the LATS itself is not signed and contains a footer on each page stating "Non Binding Terms," the record supports the Vice Chancellor's factual conclusion that "incorporation of the LATS into the Bridge Loan and Merger Agreements reflects an intent on the part of both parties to negotiate toward a license agreement with economic terms substantially similar to the terms of the LATS if the merger was not consummated." [63] The Vice Chancellor recognized that while "the economic terms [SIGA] proposed in the Draft LLC Agreement may not have 'directly contradict[ed]' the LATS ..., they differed dramatically from the LATS in favor of SIGA" [64] to the extent that they "virtually disregarded the economic terms of the LATS other than using them as a skeletal framework for the *types* of payments that would be made without giving any meaningful weight to the dollar amounts or percentages [SIGA] had negotiated earlier." [65]

■ SIGA notes that requiring parties to propose terms "substantially similar" to those in a term sheet introduces some uncertainty and litigation risk into negotiations. Because a trial judge must find both that a party's proposed terms are substantially dissimilar and that the party proposed those terms in bad faith, we think SIGA overstates the litigation risk. Under Delaware law, "bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." [66] Not only did SIGA's negotiating position differ substantially from the LATS's terms, but also the Vice Chancellor also correctly concluded that SIGA took that position in bad faith.

The record supports the Vice Chancellor's finding that "SIGA disregarded [the LATS's] terms and attempted to negotiate a definitive license agreement that contained economic and other terms drastical-

---

**62.** *Id.* (describing SIGA's position that "the parties intended the LATS simply to provide a 'jumping off point' by specifying the basic structure of a potential licensing agreement or partnership").

**63.** *Id.* The Vice Chancellor found that "[t]he extent to which the parties negotiated the economic terms of the LATS in January 2006 and the inclusion of the LATS in the Bridge Loan and Merger Agreements buttresses the conclusion that they intended those terms to be more than a mere 'jumping off point' in later negotiations." *Id.* at *23. He found it unlikely, especially in light of SIGA's cash needs at the time, "that the parties would have wasted time and money negotiating specific economic terms for the LATS without intending to give those terms significance in later negotiations." *Id.* He also found it "unlikely that the parties would have incorporated the LATS into the subsequent Bridge Loan and Merger Agreements if they intended the

LATS to provide only a rough and easily modified outline of the basic structure of the licensing agreement." *Id.* As support for his factual conclusions, the Vice Chancellor credited, among other things, "the testimony and documentary evidence PharmAthene adduced that it would not have loaned $3 million to SIGA without an assurance from SIGA that PharmAthene reasonably could expect to control ST–246 through either a merger or a license agreement in accordance with the terms of the LATS." *Id.*

**64.** *Id.* at *26.

**65.** *Id.*

**66.** *CNL–AB LLC v. E. Prop. Fund I SPE (MS REF) LLC*, 2011 WL 353529, at *9 (Del.Ch. Jan. 28, 2011) (quoting *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 n. 16 (Del.1993)) (internal quotation marks omitted).

ly different and significantly more favorable to SIGA than those in the LATS."[67] The Vice Chancellor also found that Drapkin "abdicated" his responsibility to remind SIGA of the terms to which it agreed in the LATS "and resorted instead to a selective and biased memory of the parties' negotiations. Drapkin apparently took no active role in the post-September 2006 licensing negotiations other than to offer his counterfactual recollection that the LATS [was] nothing but a 'jumping off point.'"[68] The Vice Chancellor further found that "Drapkin, and SIGA for that matter, essentially left the negotiations of the license agreement to those who either had no involvement in the previous negotiations and agreements ... or acting in their own self-interest ... were more than happy to disregard the economic importance of the LATS."[69] Evidence that "SIGA began experiencing 'seller's remorse' during the merger negotiations for having given up control of what was looking more and more like a multi-billion dollar drug" bolsters the Vice Chancellor's finding that SIGA failed to negotiate in good faith for a definitive license agreement in accordance with the terms of the LATS.[70] Therefore, we affirm the Vice Chancellor's conclusion that SIGA acted in bad faith when negotiating the license agreement in breach of its contractual obligations under both the Merger Agreement and the Bridge Loan Agreement.

### C. SIGA is not liable under a theory of promissory estoppel.

We reverse the Vice Chancellor's conclusion that SIGA was liable on the basis of promissory estoppel.[71] A claim for promissory estoppel requires a plaintiff to show the following:

(i) a promise was made;

---

67. *PharmAthene III*, 2011 WL 4390726, at *22. The Vice Chancellor considered both the specific terms SIGA proposed, *id.* at *24, and the structure of SIGA's proposal, *id.* at *26 & n. 140, when he concluded that the proposal "bore no resemblance to the economic terms of the LATS and, not surprisingly, resulted in the parties failing to reach agreement on a license agreement." *Id.* at *26.

68. *Id.* at *25. In making this factual determination, the Vice Chancellor made credibility judgments which deserve deference. *Id.* at *25 n. 129 ("Drapkin actually may have had as superficial an understanding of the situation as he claimed or simply may have forgotten the substance of the parties' communications. In any event, I find Drapkin's testimony to be largely subjective and otherwise unreliable, especially as it pertains to his belittlement of the LATS as a mere 'jumping off point.'").

69. *Id.* at *25.

70. *Id.* at *24; *see id.* at *8 (citation omitted) (during merger negotiations and after receiving a significant grant, "Konatich wrote to [Hruby] that 'it is a damn shame we had to merge,' [and] Hruby responded, 'You got that right.... Had [the former CEO of SIGA] not gotten us behind the curve through ineptitude, we would still be an independent company and standing to make some real dough ... we could have gone all the way ourselves'" (omissions in original)); *id.* at *9 (citation omitted) (before terminating the merger, an in-house MAF lawyer asked in an email, "should SIGA continue with its merger plans or should it try to go it alone?" (internal quotation marks omitted)).

71. PharmAthene argues that SIGA waived its argument that the Bridge Loan and Merger Agreements precluded application of promissory estoppel. Answering–Opening Br. 27. We disagree. We do not address whether SIGA failed to present this argument to the Vice Chancellor because the Vice Chancellor's ruling identifies valid contracts governing the promise he found gave rise to a promissory estoppel claim. Therefore, SIGA's current argument arises from the Vice Chancellor's decision and the interests of justice require we address it. Supr. Ct. R. 8; *Reddy v. MBKS Co.*, 945 A.2d 1080, 1085–86 (Del.2008).

(ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee;

(iii) the promisee reasonably relied on the promise and took action to his detriment; and

(iv) such promise is binding because injustice can be avoided only by enforcement of the promise.[72]

 The Vice Chancellor based his finding of liability arising from promissory estoppel on "SIGA's promise to afford [PharmAthene] a good faith opportunity to obtain control of ST–246, and not solely in exchange for interest on a secured loan." [73] Promissory estoppel does not apply, however, where a fully integrated, enforceable contract governs the promise at issue.[74] The promise to negotiate in good faith for a definitive license agreement in accordance with the LATS's terms is expressly included in both the Bridge Loan and Merger Agreements. Therefore, a claim based on promissory estoppel cannot lie and a Vice Chancellor must look to the contract as the source of a remedy on the breach of an obligation to negotiate in good faith.

### D. Proper Remedy

We now turn to the question of what is the proper contractual remedy for breach of an agreement to negotiate in good faith where the court finds as fact that the parties, had they negotiated in good faith, would have reached an agreement. Our decisions have not clearly answered this question. In *Titan Investment Fund II, LP v. Freedom Mortgage Corp.*, we reversed the Superior Court judge's award of a one-percent commitment fee for breach of an agreement to negotiate in good faith.[75] We noted that it was "fatally inconsistent" for the trial judge to conclude "that the contract would not have closed[,] even absent Freedom's breach," and at the same time award damages "that presupposed the opposite conclusion, namely, that the deal would have closed." [76] We concluded that given the plaintiff's "inability to establish that the ... [c]ontract would have closed but for [the defendant's] breach, [the plaintiff was] not entitled to damages measured on a 'benefit-of-the-bargain' basis. Rather, [the plaintiff] was entitled only to its 'reliance' damages, measured by its actually-incurred costs and expenses." [77]

In *RGC International Investors, LDC v. Greka Energy Corp.*,[78] although that Vice Chancellor confusingly awarded damages for both breach of an obligation to negoti-

---

72. *Chrysler Corp., (Del.) v. Chaplake Hldgs., Ltd.*, 822 A.2d 1024, 1032 (Del.2003) (quoting *Lord v. Souder*, 748 A.2d 393, 399 (Del.2000)).

73. *PharmAthene III*, 2011 WL 4390726, at *27. The Vice Chancellor also noted that "SIGA promised PharmAthene that, at the very least, it could expect to receive control over ST–246 through a license agreement with economic terms similar to the LATS," *id.*, but it appears that this expectation arose from the good faith obligation which he later identifies as the promise.

74. *Cf. Chrysler*, 822 A.2d at 1033–34 (noting in response to an argument that "existing written contracts between the parties governed the relationship, and therefore promis-sory estoppel is inapplicable" that "the promises made ... were in addition to the existing relationship").

75. *Titan Inv. Fund II, LP v. Freedom Mortg. Corp.*, 58 A.3d 984, 2012 WL 6049157, at *3 (Del. Dec. 5, 2012) (ORDER).

76. *Id.*

77. *Id.*

78. 2001 WL 984689 (Del.Ch. Aug. 22, 2001), *overruled on other grounds by Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 2013 WL 1914714 (Del.2013).

ate and promissory estoppel,[79] he concluded that he should "award damages and security in the amount equal to what [the plaintiff] should have received" under the term sheet.[80] He reasoned that the award was not speculative because the term sheet embodied "how the parties themselves agreed to value [the defendant's] obligations to" the plaintiff.[81]

■ Even though our choice of law analysis mandates that we apply Delaware law, we find other courts' analyses instructive. Federal courts interpreting New York law recognize two types of binding preliminary agreements, "Type I" and "Type II."[82] Parties create a Type II preliminary agreement when they "agree on certain major terms, but leave other terms open for further negotiation."[83] "[T]he parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement."[84] A Type II agreement "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework."[85]

In *Goodstein Construction Corp. v. City of New York*, the New York Court of Appeals established that New York law limits a plaintiff to reliance damages for breach of an agreement to negotiate, without distinguishing between Type I and Type II agreements.[86] In *Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*, the United States Court of Appeals for the Eighth Circuit, applying New York law, considered the remedies available for breach of a Type II binding preliminary agreement.[87] The court recognized that "New York's intermediate appellate courts have … read *Goodstein* … as categorically precluding expecta[tion] damages for breach of a [Type II] binding preliminary agreement to negotiate a final agreement in good faith."[88] The court nevertheless commented that it was "not as confident … that *Goodstein* … should be read as categorically precluding benefit-of-the-bargain damages for all breaches of binding

79. *See supra* notes 72–74 and accompanying text (explaining that promissory estoppel cannot arise based on a promise contained in a fully enforceable contract).

80. *RGC Int'l*, 2001 WL 984689, at *16.

81. *Id.*

82. *Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*, 519 F.3d 421, 426–27 (8th Cir.2008) (citations omitted). A Type I agreement "is a fully binding preliminary agreement, which is created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document. Such an agreement is fully binding…." *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir.1998) (citations omitted).

83. *Adjustrite*, 145 F.3d at 548.

84. *Teachers Ins. & Annuity Ass'n. of Am. v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y. 1987) (citations omitted).

85. *Id.* A Type II agreement "does not guarantee" the parties will reach agreement on a final contract because of "good faith differences in the negotiation of the open issues" may preclude final agreement. *Id.* A Type II agreement "does, however, bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." *Id.*

86. *Goodstein Constr. Corp. v. City of New York*, 80 N.Y.2d 366, 590 N.Y.S.2d 425, 604 N.E.2d 1356, 1360 (1992).

87. *Fairbrook*, 519 F.3d at 428–30.

88. *Id.* at 428 n. 7 (citations omitted).

preliminary agreements to negotiate a final agreement in good faith."[89] The court, citing conflicting majority and concurring opinions in *Venture Associates Corp. v. Zenith Data Systems Corp.*,[90] noted that it was "a difficult, largely unsettled question of remedies."[91]

The Eighth Circuit then proceeded to analyze the question of whether *Goodstein* would bar expectation damages for breach of a Type II agreement. The Eighth Circuit noted that the *Goodstein* court rejected expectation damages because there would be no way to measure them without knowing whether the parties would have reached an agreement.[92] The Eighth Circuit questioned whether *Goodstein* would still apply if a judge could discern "what agreement would have been reached."[93] Ultimately, the Eighth Circuit declined to award expectation damages because the "[t]erm [s]heet was silent on significant issues" and "the missing terms [could not] be judicially determined by objective criteria in the [t]erm [s]heet itself or in commercial practice, usage, or custom."[94]

Similarly, in *Venture Associates*, the Seventh Circuit Court of Appeals addressed "a binding agreement to negotiate in good faith toward the formation of a contract of sale" under Illinois law.[95] The majority noted that "if the plaintiff can prove that ... [but] for the defendant's bad faith[,] the parties would have made a final contract, then the loss of the benefit of the contract is a consequence of the defendant's bad faith," and the defendant is liable for that loss if it is foreseeable.[96] In a concurring opinion, Judge Cudahy noted his disagreement, as a public policy matter, with the majority on that point.[97]

■■■■■■ Our decision in *Titan Investment* leaves open the question of whether expectation damages are available where the trial judge makes a factual finding that the parties would have reached agreement but for the defendant's breach. In fashioning his remedy, the Vice Chancellor noted the lack of consensus.[98] We now hold that where the parties have a Type II preliminary agreement to negotiate in

---

**89.** *Id.* at 429.

**90.** 96 F.3d 275 (7th Cir.1996) (applying Illinois law).

**91.** *Fairbrook*, 519 F.3d at 429 (citing *Venture Assocs.*, 96 F.3d at 278, 281).

**92.** *Id.* (quoting *Goodstein Constr. Corp. v. City of New York*, 80 N.Y.2d 366, 590 N.Y.S.2d 425, 604 N.E.2d 1356, 1361 (1992)).

**93.** *Id.*

**94.** *Id.* at 430.

**95.** *Venture Assocs.*, 96 F.3d at 277.

**96.** *Id.* at 278 (citations omitted). Judge Posner, writing for the majority, addressed "the practicality of the remedy" and noted that "[t]he difficulty, which may well be insuperable, is that since by hypothesis the parties had not agreed on any of the terms of their contract, it may be impossible to determine what those terms would have been and hence what profit the victim of bad faith would have had." *Id.* at 278–79 (citations omitted).

**97.** *Id.* at 281 (Cudahy, J., concurring) ("As a matter of policy, I think it is undesirable to force agreement on parties under threat of a bad faith finding and subsequent imposition of consequential damages" and would instead limit a plaintiff to reliance damages for "breach of an agreement to negotiate in good faith.").

**98.** *PharmAthene IV*, 2011 WL 6392906, at *3 (Del.Ch. Dec. 16, 2011) (citing *PharmAthene III*, 2011 WL 4390726, at *31–34 (Del.Ch. Sept. 22, 2011)) ("In [*PharmAthene III*], the Court acknowledged that there apparently is not yet a consensus in Delaware or in other jurisdictions as to whether a breach of an express contractual obligation to negotiate in good faith is susceptible to a remedy at law of expectation damages, or limited to only reliance damages.").

good faith, and the trial judge makes a factual finding, supported by the record, that the parties would have reached an agreement but for the defendant's bad faith negotiations, the plaintiff is entitled to recover contract expectation damages.[99]

 In this case, the Vice Chancellor made two key factual findings, supported by the record: (1) "the parties memorialized the basic terms of a transaction in . . . the LATS, and expressly agreed in the Bridge Loan and Merger Agreements that they would negotiate in good faith a final transaction in accordance with those terms"[100] and (2) "but for SIGA's bad faith negotiations, the parties would have con-summated a license agreement."[101] The Vice Chancellor's factual conclusions support a finding that SIGA and PharmAthene entered into a Type II preliminary agreement and that neither party could in good faith propose terms inconsistent with that agreement. Because we had not previously addressed whether Delaware recognizes Type II preliminary agreements and permits a plaintiff to recover expectation damages, and because it is unclear to what extent the Vice Chancellor based his damages award upon a promissory estoppel holding rather than upon a contractual theory of liability predicated on a Type II preliminary agreement,[102] we reverse the

99. An expectation damages award presupposes that the plaintiff can prove damages with reasonable certainty. *Callahan v. Rafail*, 2001 WL 283012, at *1 (Del.Super. Mar. 16, 2001) (citation omitted) ("It is well-settled law that 'a recovery for lost profits will be allowed only if their loss is capable of being proved, with a reasonable degree of certainty. No recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative.' ").

100. *PharmAthene III*, 2011 WL 4390726, at *35. The Vice Chancellor ultimately found that the Bridge Loan and Merger Agreements "required the parties to negotiate in good faith a license agreement with economic terms substantially similar to those contained in the LATS." *Id.* at *23. He also found "that the parties also recognized that the negotiations probably would introduce new terms and lead to some adjustment of terms expressly embodied in the LATS, while other terms in the LATS were almost certain to remain." *Id.* at *35.

101. *PharmAthene IV*, 2011 WL 6392906, at *4; *see also PharmAthene III*, 2011 WL 4390726, at *40, *42.

102. *See PharmAthene III*, 2011 WL 4390726, at *29 ("As a threshold matter, the remedies for breach of contract and under the doctrine of promissory estoppel can, and often do, overlap. . . . Therefore, I address the appropriate remedy for both the breach of contract and promissory estoppel claims together in the following subparts."); *see also id.* at *38 (Del.Ch. Sept. 22, 2011) ("SIGA had a duty under the Bridge Loan and Merger Agreements to negotiate in good faith. SIGA's breach of that obligation, for all of the reasons discussed *supra*, was inequitable to PharmAthene. In addition, SIGA has been enriched by its inequitable conduct."); *id.* at *39 ("SIGA further objects to a remedy in the form of a payment stream on the ground that it would reverse the structure of the transaction contemplated by the LATS [concerning control of the ST–246 patents and the direction of any royalty payments]. . . . The structure is reversed, but SIGA's wrongdoing necessitates that."). We note that when explaining his damage award, the Vice Chancellor found the reasoning in *RGC International* supportive of an equitable payment stream, but he relied on the portion of *RGC International* which awarded fees both because the defendant breached its " 'obligation to negotiate in good faith *and* [because the plaintiff] reasonably relied on the promises made by [the defendant] and thereby took action to its detriment.' " *Id.* at *37 (quoting *RGC Int'l Investors, LDC v. Greka Energy Corp.*, 2001 WL 984689, at *16 (Del.Ch. Aug. 22, 2001), *overruled on other grounds by Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund,* 68 A.3d 665, 2013 WL 1914714 (Del.2013)). We hold, however, that where a fully integrated contract encompasses the promise at issue, promissory estoppel does not apply. *See supra* note 74 and accompanying text.

Vice Chancellor's damages award and remand the case for reconsideration of the damages award consistent with this opinion.

### E. Attorneys' Fees

The Vice Chancellor awarded attorneys fees based on both the Bridge Loan Agreement's contractual fee-shifting provisions and on the bad faith exception to the American Rule.[103] He also awarded PharmAthene a portion of its expert witness costs under 10 *Del. C.* § 8906 and Court of Chancery Rule 54(d).[104] "Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs."[105] In contract litigation, where the contract contains a fee-shifting provision, we will enforce that provision.[106]

We affirm the Vice Chancellor's conclusion that SIGA breached its contractual obligation to negotiate in good faith in both the Bridge Loan and Merger Agreements. The Bridge Loan Agreement contains two provisions that shift attorneys' fees and expenses for a breach of that agreement.[107] We also affirm the Vice Chancellor's conclusion, based on the plain meaning of these provisions, that SIGA is liable for PharmAthene's reasonable fees and costs that arise out of SIGA's breach of Bridge Loan Agreement Section 2.3's obligation to negotiate in good faith.[108] Accordingly, we do not reach or address the Vice Chancellor's alternative holding that PharmAthene is entitled to attorneys' fees based on the bad faith exception to the American Rule.[109]

---

**103.** *PharmAthene III*, 2011 WL 4390726, at *43–44.

**104.** *Id.* at *45 & n. 263.

**105.** *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del.2007) (citing *Chrysler Corp. v. Dann*, 223 A.2d 384, 386 (Del.1966)).

**106.** *See id.* (citations omitted) ("An exception to [the American] rule is found in contract litigation that involves a fee shifting provision.").

**107.** Bridge Loan Agreement Section 7.5 provides that the "Issuer [SIGA] shall pay, and hold the Holder [PharmAthene] harmless against all liability for the payment of, all costs and other expenses incurred by any such Holder in connection with the Issuer's performance of and compliance with all agreements and conditions set forth herein." *PharmAthene III*, 2011 WL 4390726, at *43 (alteration in original). Similarly, Bridge Loan Agreement Section 7.6 provides that:

> The Issuer will defend, indemnify, and hold harmless the Holder ... from and against any and all claims, demands, penalties, causes of action, fines, liabilities, settlements, damages, costs, or expenses of whatever kind or nature ... (including, without limitation, counsel and consultant fees and

expenses ...) arising out of this Agreement ... or the transactions contemplated hereby ...; or in any way related to the inaccuracy, breach of or default under any representations, warranties or covenants of the Issuer set forth herein....

*Id.* (omissions in original).

**108.** *See id.* ("Based on the plain meanings of SIGA's obligations under Section 7.5 to 'pay all costs and other expenses incurred by [PharmAthene] in connection with [SIGA's] performance' of the Bridge Loan Agreement as well as under Section 7.6 to 'defend, indemnify, and hold harmless' PharmAthene from 'expenses of whatever kind or nature ... (including, without limitation, counsel and consultant fees and expenses)' that 'in any way relate[] to ... [SIGA's] breach of ... any ... covenants,' I also conclude that PharmAthene is entitled to recover its attorneys' fees and expenses in this action related to SIGA's breach." (alterations and omissions in original)).

**109.** *See id.* at *44. We do, however, address the basis for his award to the extent that we note the Court of Chancery's power to award attorneys' fees in an appropriate case stems not from the statutory power to award costs embodied in 10 *Del. C.* § 5106, but rather from his inherent equitable authority. *Scion*

■ "Delaware law dictates that, in fee shifting cases, a judge determine whether the fees requested are reasonable."[110] When considering his fee award, the Vice Chancellor properly tailored the award to the bases for liability on which PharmAthene prevailed.[111] However, we reverse at least one basis on which the Vice Chancellor predicated the fee award. The Vice Chancellor also tailored his award of expert witness fees to account for those portions of expert evidence he found unhelpful when determining the damage award.[112] On remand, the Vice Chancellor shall redetermine his damage award in light of this opinion and is free to reevaluate the helpfulness of expert testimony. Therefore, we reverse the award of attorneys' fees and expenses so that the Vice Chancellor may determine on remand the proper award consistent with this opinion.

### F. PharmAthene's Cross–Appeal

PharmAthene's claims that it is entitled to (1) an alternative payment stream based on the LATS's terms, (2) specific performance granting it a license in accordance with the LATS's terms because the LATS is an enforceable contract, or (3) recover damages under the doctrine of unjust enrichment. All those claims are alternative contentions advanced in the event we do not affirm the Vice Chancellor's judgment.[113] Because we affirm the Vice Chancellor's finding that SIGA is liable for breaching its contractual obligations to negotiate in good faith in accordance with the LATS's terms, we do not reach these arguments. PharmAthene also contends that the Vice Chancellor erroneously failed to award PharmAthene its lump-sum expectation damages on the basis that they would be too speculative.[114] We do not reach this claim either, because we reverse the Vice Chancellor's damages award and remand for him to reconsider it in light of this opinion.

### IV. CONCLUSION

For these reasons, we AFFIRM the Court of Chancery's judgment in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

---

*Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund,* 68 A.3d 665, 686–88, 2013 WL 1914714, at *12 (Del.2013) (overturning a line of cases improperly conflating "the Court of Chancery's inherent equitable power to award fees in a proper case with the statutory authority to award costs where the equities dictate under 10 *Del. C.* § 5106").

110. *Mahani,* 935 A.2d at 245 (citing Del. Lawyers' Rules of Prof'l Conduct R. 1.5(a)(1)(a)).

111. *PharmAthene III,* 2011 WL 4390726, at *44 ("[M]y sense is that only one-third of PharmAthene's arguments, time, and expense related to the bases of liability and form of relief I have found and ordered, respectively.").

112. *Id.* at *45.

113. *See* Answering–Opening Br. 37, 38, 48.

114. *Id.* at 44–47.