**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| GONE GB LTD. and ORI GERSHT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. N21C-05-198 EMD CCLD |
| | ) | |
| INTEL SERVICES DIVISION, LLC | ) | |
| and INTEL CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Submitted: December 2, 2022[1]
Decided: December 8, 2022

*Upon Defendants' Motion for Partial Judgment on the Pleadings*
*Dismissing Counts I and III—VII and Enforcing Limitation of Liability*
**GRANTED**

David E. Wilks, Esquire, Wilks Law, LLC, Wilmington, Delaware, David Leichtman, Esquire, Leichtman Law PLLC, New York, New York. *Attorneys for Plaintiff Gone GB LTD and Ori Gersht.*

Matthew E. Fischer, Esquire, Jonathan A. Choa, Esquire, Jacqueline A. Rogers, Esquire, Carla M. Jones, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, Vanessa Soriano Power, Esquire, Stoel Rives LLP, Seattle, Washington, Samantha K. Sondag, Esquire, Stoel Rives LLP, Portland, Oregon. *Attorneys for Defendants Intel Services Division, LLC and Intel Corporation.*

**DAVIS, J.**

## I.    INTRODUCTION

This is a breach of contract and torts action assigned to the Complex Commercial Litigation Division of this Court. Plaintiffs Gone GB LTD ("Gone") and Ori Gersht (collectively, "Plaintiffs") commenced this action against Defendants Intel Services Division, LLC and Intel Corporation (collectively, "Intel"). Plaintiffs asserted eight (8) counts against

---

[1] D.I. No. 38.

Intel, arguing that Intel wrongfully terminated the contract and committed several torts. Plaintiffs seek more than $3 million in damages.

Intel filed an answer with defenses to the counts and denying all tort claims asserted by the Plaintiffs. Intel also moved for partial judgment on Counts I and III—VII and to enforce a limitation of liability provision (the "Motion"). Intel asserts that the contract among the parties was fully integrated and provides for an agreed upon liability clause for direct damages arising from the contract. In addition, Intel contends that Plaintiffs' tort claims are insufficiently pled.

For the reasons stated below, the Court **GRANTS** the Motion.

## II. RELEVANT FACTS

### A. FACTUAL BACKGROUND

Mr. Gersht is an artist working principally with photography and film.[2] Mr. Gersht is based in London, United Kingdom.[3] Mr. Gersht utilizes technology in his art.[4] Gone is a United Kingdom company.[5] Gone is partially owned by Mr. Gersht.[6] Mr. Gersht contracts his services and art through Gone.

Intel Corporation and its wholly owned subsidiary, Intel Services Division, LLC, are both incorporated in Delaware, with principal place of business in Los Angeles, and Santa Clara, California, respectively.[7] Intel Corporation founded Intel Studios to "develop, manufacture, and sell immersive experiences, including virtual reality, through what is known as volumetric imaging."[8]

---

[2] Am. Compl. ¶¶ 2-3, 9.
[3] *Id.*
[4] *Id.* ¶ 13.
[5] *Id.* ¶ 3.
[6] *Id.*
[7] *Id.* ¶¶ 4-5.
[8] Defendants' Motion for Partial Judgment on the Pleadings and Enforcing Limitation of Liability ("Defs.' Motion for PJP") at 3.

In 2018, Intel and Plaintiffs "began discussing a potential collaboration on a volumetric imaging project . . . the initial terms of that discussion were committed to a non-binding Memorandum of Understanding with an effective date of April 1, 2019."[9]  On June 1, 2019, Gone and Intel entered into the Intel Co-Production Agreement (the "Agreement").[10]  The "Effective Date" of the Agreement is June 1, 2019 and the "Expiration Date" of the Agreement is June 1, 2022.[11]  Mr. Gersht signed on behalf of Gone.[12]  In addition, Gone acknowledges that all participation under the Agreement will be by Mr. Gersht "personally on behalf of Gone GB LTD."[13]

The agreement was to create a virtual reality-based art piece utilizing Intel's volumetric imaging technology to create a 3D environment that participants would "travel" through during the exhibition (the "Project").[14]  Under the Agreement, "Intel and Gone would 'co-develop, co-produce, distribute, and exploit one or more Works as described in the relevant [Statement of Work] and in accordance with the terms and conditions of this Agreement.'"[15]  Intel would provide the services of Intel Studio, including use of Intel providing the studio space, Intel personnel for capturing, processing, and storing the data captured at the studio, and use of Intel's proprietary software for developing the data into functioning, volumetric images.[16]  Mr. Gersht, standing in place of Gone in the Agreement, would provide the creative direction for the Project.[17]

---

[9] Defendants' Answer and Defenses to First Amendment Complaint ("Defs.' Answer") at 15.
[10] Defs.' Mot. at 4.
[11] Agreement at 1.
[12] *Id.* at 15.
[13] *Id.* § 2.2.
[14] *Id.* at 1.
[15] *Id.* § 2.1.
[16] Defs.' Mot. at 5.
[17] Agreement § 2.2.

In September 2020, Intel decided to close Intel Studios, partly due to the business impact of COVID.[18]  On September 23, 2020, Intel notified Mr. Gersht that Intel was closing Intel Services and terminating the Agreement between Gone and Intel.[19]

## B.  PROCEDURAL HISTORY

On June 1, 2021, Plaintiffs filed the complaint with the Court.[20]  On July 1, 2021, Intel removed the case to the United States District Court for the District of Delaware.[21]  On March 28. 2022, the District Court dismissed with prejudice Plaintiffs' federal claim for Computer Fraud and Abuse Act and remanded the civil action back to the Court.[22]

On June 9, 2022, Plaintiffs filed an Amended Complaint asserting eight counts against Intel.[23]  On June 24, 2022, Intel filed an Answer and the Motion.[24]  On July 27, 2022, Plaintiffs filed an Answering Brief in Opposition to Intel's Motion for Partial Judgment on the Pleadings (the "Opposition").[25]  On August 10, 2022, Intel filed a Reply in Support of their Motion for Partial Judgment on the Pleadings (the "Reply").[26]

The Court held a hearing on the Motion, the Opposition and the Reply on September 23, 2022.[27]  At the conclusion of the hearing, the Court took the Motion under advisement.  This is the Court's decision on the Motion.

---

[18] Defs.' Mot. at 8.
[19] Am. Compl. ¶ 138.
[20] D.I. No. 1
[21] D.I. No. 4
[22] D.I. No. 5
[23] D.I. No. 21.
[24] D.I. No. 23
[25] D.I. No. 28
[26] D.I. No. 30
[27] D.I. No. 37.

### III. PARTIES' CONTENTIONS

#### A. THE MOTION

Intel contends that Counts I and III – VIII should be dismissed because: (i) the claims are already within the scope of the Agreement and Plaintiffs' existing contractual obligations, and (ii) Plaintiffs failed to state a claim upon which relief can be granted. Intel also maintains that the Limitations of Liability clause already provides an agreed-upon remedy for the present matter.

Intel notes that Count I (Estoppel and Promissory Estoppel), Count VI (Quantum Meruit), Count VII (Conversion), and Count VIII (Unjust Enrichment and Restitution) are quasi-contractual claims that apply when there is no written agreement between the parties. As such, Intel contends that these counts should be dismissed because the Agreement governs the relationship between the parties, and Plaintiffs' claims are already within the scope of Plaintiffs' existing contractual obligations under the Agreement.

Intel also argues that Count III (Breach of the Implied Covenant of Good Faith and Fair Dealing), Count IV (Tortious Interference with Contract), and Count V (Tortious Interference with Prospective Economic Relationships) fail to state valid claims upon which relief can be granted. Lastly, Intel asserts that the Agreement's Limitation of Liability clause should limit any surviving claims. Intel notes that the clause caps any actual and direct damages arising from and out of the Agreement to $50,000.

#### B. THE OPPOSITION

Plaintiffs contend that Intel induced Mr. Gersht to make contractual commitments to third parties in furtherance of the Project by making additional promises and undertakings beyond the

Agreement to Gone.[28]  When Intel terminated the Agreement, Plaintiffs claim this led to a "chain of consequences that [Intel] knew would cause irretrievable harm to [Gone]," resulting in Gone incurring damages and reputational injury in the art industry.

Plaintiffs also argue that Intel was aware of Mr. Gersht's two-year commitment cycles to art projects.  By terminating the Project near the two-year mark, therefore, Intel caused Plaintiffs to lose out on the expected millions of dollars in profit from the Project.  Plaintiffs contend that the damages resulting from Intel's breach of contract and torts amounts to at least $3 million, with the exact amount to be determined at trial.

Plaintiffs disagree with Intel's interpretation of the Limitation of Liability clause. Plaintiffs argue that as the clause does not speak to a termination without cause.  In support, Plaintiffs cite to (i) Section 12.4: "Parties have all other remedies at law or in equity available whether or not this Agreement is terminated,"[29] and (ii) Section 12.2: "[i]n addition to any other remedies under this Agreement, or as may be available at law or in equity, either party may terminate this Agreement for cause. . . ."[30]  Plaintiffs contend that Sections 12.2 and 12.4 render the Limitation of Liability clause ambiguous, and the most plausible interpretation of the provisions shows that "the parties intended different remedies to apply to claims of improper termination, where the parties would have available all remedies for all harm actually suffered, as opposed to other types of breach."[31]

---

[28] Plaintiffs' Answering Brief in Opposition to Defendants' Motion ("Pls.' Answering Br.") at 2.
[29] Pls.' Answering Br. at 24, citing Agreement § 12.4.
[30] Intel Co-Production Agreement ("Agreement") § 12.2.
[31] Pls.' Answering Br. at 25.

## IV.     STANDARD OF REVIEW

A party may move for judgment on the pleadings pursuant to Civil Rule 12(c).[32]  In determining a motion under Civil Rule 12(c) for judgment on the pleadings, the Court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party.[33]  The Court must take the well-pleaded facts alleged in the complaint as admitted.[34]  When considering a motion under Civil Rule 12(c), the Court also assumes the truthfulness of all well-pled allegations of fact in the complaint.[35]  The Court must, therefore, accord plaintiffs opposing a Rule 12(c) motion the same benefits as a plaintiff defending a motion under Civil Rule 12(b)(6).[36]  The Court may grant a motion for judgment on the pleadings only when no material issue of fact exists and the movant is entitled to judgment as a matter of law.[37]

## V.     DISCUSSION

As an initial point, the Court finds that a valid agreement exists between Gone and Intel. While not specifically argued, the Agreement is supported by consideration, contains all material provisions, and the parties performed numerous obligations under the Agreement prior to Intel notifying Mr. Gersht, on September 23, 2020, that Intel was closing Intel Services and

---

[32] Civil Rule 12(c) provides:
> *Motion for judgment on the pleadings*. -- After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings.  If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Del. Super. Civ. R. 12(c).

[33] *See Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993); *see also Warner Commc'ns, Inc. v. Chris–Craft Indus., Inc.*, 583 A.2d 962, 965 (Del. Super. 1989), *aff'd without opinion* 567 A.2d 419 (Del. 1989).

[34] *See Desert Equities*, 624 A.2d at 1205; *Warner Commc'ns*, 583 A.2d at 965.

[35] *See McMillan v. Intercargo Corp.*, 768 A.2d 492, 500 (Del. Ch. 2000).

[36] *See id.*

[37] *See Desert Equities*, 624 A.2d at 1205; *Warner Commc'ns*, 583 A.2d at 965.

terminating the Agreement between Gone and Intel.[38]  The Court makes this finding owing to the number of quasi-contractual claims made in the Amended Complaint.

### A.  COUNT I IS NOT A VIABLE CAUSE OF ACTION FOR PROMISSORY ESTOPPEL.

Under Delaware law, a party seeking a promissory estoppel claim must show: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promise; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise.[39]  Promissory estoppel is also not applicable when there is a fully integrated, binding contract governing the "promise" in contention.[40]

It is unclear from the Plaintiffs' arguments how Plaintiffs were induced by Intel to act in furtherance of the Project beyond their contractual duties in the Agreement.  While Plaintiffs allege that there is both an estoppel and a promissory estoppel present, the arguments only vaguely refer to a contractual promissory estoppel claim.  As stated in the Reply, Plaintiffs failed to address arguments as to the estoppel claim in the Opposition.

The Court finds that this failure constitutes a waiver as to Count I.  In addition, Plaintiffs do not present sufficient evidence or facts to support the claim beyond simply stating that Intel made "new promises and representations to Plaintiffs after the signing of the [Agreement] to induce Mr. Gersht to perform additional work . . ."[41]

Accordingly, Plaintiffs do not meet the legal standard for pleading promissory estoppel.  Plaintiffs refer to the fact that Intel sent Intel Studios employees to work with Plaintiffs on the Project to evince that Intel made promises outside of the Agreement.  Plaintiffs state that "the

---

[38] Am. Compl. ¶ 138.
[39] *Windsor I, LLC v. CWCapital Asset Management LLC*, 238 A.3d 863, 876 (Del. 2020).
[40] *See SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 348 (Del. 2013).
[41] Am. Compl. ¶ 185

8

sole purpose of Plaintiffs' work with the Architect, the Project Producer and the Development Assistant, all commitments made by Intel not required by the [Agreement] but made after its effective date and its signing date, was the preparation for the physical installation and exhibition of the final work . . . ."[42] Plaintiffs allege that these contributions by Intel, and Intel's "inducement" for Gersht to "extend his relationships with art galleries, art venues, and museums to find multiple venues for the Project" amounted to "new promises and representations" post-Agreement.[43] Plaintiffs also point to Intel's promises to fund the installation of the Project as an inducing promise beyond the Agreement.[44]

Intel contends that Intel's contributions made to the Project were already within its contractual obligations under the Agreement, and do not amount to any new promises or engagements outside of the Agreement.[45] The Statement of Work attached to the executed Agreement states:

> **Contribution of the Parties**
> Intel intends to provide Studio services throughout all phases of the collaboration. Studio services include creative consultation, technology implementation, and use of Intel facilities. For the capture of volumetric video, Intel intends to provide Pre-Production services including material testing and technology consultations to the Artist, Production crew, Intel Studios stage . . . [Plaintiffs] intends to support outreach to galleries and artistic community to secure locations for the Catalyst Phase.
>
> [Plaintiffs] intends to support outreach to galleries and artistic community to secure locations for the Catalyst Phase, collaborating with members of Intel Studios team in the process. [Plaintiffs] intends to support all Intel distribution and promotional efforts through attendance at prioritized festivals and events, providing Press interviews and testimony.
>
> **Financial Terms**
> Intel will fund Production and Development activities for the Work. Intel and [Plaintiffs] will endeavor to obtain additional funding from a third party for large

---

[42] Am. Compl. ¶ 187.
[43] *Id.* ¶¶ 185 – 189.
[44] *Id.* ¶ 148.
[45] Defs.' Mot. at 13.

scale installation and distribution. The Parties will jointly identify a list of potential targets to approach and engage. Intel will compensate the Artiest with fees totaling $108,000.

The Court notes that Intel's actions in sending their employees to assist Plaintiffs in the Project and funding the installation of the Project falls within Intel's existing contractual obligations under the Agreement and the Statement of Work. As pled and argued, Plaintiffs do not present any new evidence or arguments of Intel's alleged promises or inducements beyond the Agreement to support their promissory estoppel claim. As such, the Court finds that Plaintiffs fail to meet any of the elements for a promissory estoppel claim. The Court will therefore dismiss Count I.

**B.     THE COURT WILL DISMISS COUNT III FOR FAILING TO STATE A CLAIM FOR BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING.**

Under Delaware law, a claim for a breach of the implied duty of good faith and fair dealing requires the plaintiff to adequately show: (i) a specific implied contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) resulting damages.[46] Courts should "assess the parties' reasonable expectations at the time of contracting, and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal."[47] A party generally cannot "base a claim for breach of the implied covenant on conduct authorized by the agreement. We will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected."[48]

Plaintiffs argue that Intel acted in bad faith when Intel "falsely [told] Plaintiffs that it was working on the technical issues throughout June and July 2020, misleading Mr. Gersht into

---

[46] *See Blaustein v. Lord Baltimore Capital Corp.*, 2012 WL 2126111, at *5 (Del. Ch. May 31, 2012)
[47] *Nemec v. Shrader*, 991 A.2d 1120, 1125-26 (Del. 2010).
[48] *Id.*

10

believing his work was safe while Intel was in the process of destroying it."[49] Plaintiffs allege that Intel made the decision to shut down Intel Studios in February or March of 2020 but continued to express to Plaintiffs that the Project was on track.[50]

Plaintiffs also claim that when Intel shut down the Intel Studios subsidiary, Intel acted in bad faith by failing to "timely advise Mr. Gersht and Gone GB of Intel's decision to shut down intel Studios" which would have allegedly provided Plaintiffs an opportunity to "raise the funds to engage the software engineers and license Intel's proprietary software" before the Project was terminated.[51] In short, Plaintiffs allege that Intel had an implied duty to notify Plaintiffs of Intel's business decision to shut down Intel Studios and offer the Plaintiffs an opportunity to purchase or license the proprietary software necessary to complete the Project. Nothing in the Agreement, however, supports these claims.

Here, Plaintiffs fail to offer any evidence that shows Intel breached an implied contractual obligation owed to Plaintiff beyond the terms of the Agreement. Plaintiffs' argument that Intel purposely hid the fact that Intel was closing Intel Studios while "destroying" the Plaintiffs' work is unsupported by any evidence on the record. Additionally, the idea that the Plaintiffs could have licensed the proprietary software to finish the Project is contradicted by the Agreement itself, which states:

> **No Other Licenses**
> Neither party grants to the other Party any license or rights (by implication, estoppel, or otherwise) in Intellectual Property Rights it owns, is licensed to, or controls before, during or after entering into this Agreement, except as expressly granted in this Agreement.[52]

---

[49] Pls.' Answering Br. 13.
[50] Am. Compl. ¶¶ 144-47.
[51] *Id.* ¶¶ 200-203.
[52] Agreement § 4.3.

Plaintiffs' arguments do not sufficiently show that Intel acted "arbitrarily or unreasonably" in a way that frustrated the Agreement. Moreover, Plaintiffs do not sufficiently plead an implied duty by Intel to give advanced notice of the business decision to close Intel Studios. Plaintiffs' claims that Intel acted in bad faith and misled Plaintiffs is also unsubstantiated, and not supported by any factual allegations. The Court will therefore dismiss Count III.

C.   **THE COURT WILL DISMISS COUNT IV AND COUNT V FOR FAILING TO STATE CLAIMS UPON WHICH RELIEF CAN BE GRANTED.**

Under Delaware law, a claim for tortious interference with a contract requires plaintiffs to show: (i) a contract, (ii) of which the defendant knew, and (iii) an intentional act by the defendant that is a significant factor in causing the breach of such contract, (iv) without justification, and (v) causes injury.[53] The plaintiff has the burden of showing that the defendant acted "maliciously or in bad faith to injure plaintiff."[54]

Under Delaware law, a claim for tortious interference with prospective business relations requires plaintiffs to establish (i) the reasonable probability of a business opportunity, (ii) the intentional interference by defendant with that opportunity, (iii) proximate causation, and (iv) damages.[55] The business opportunity must not be a mere "perception" by the plaintiff and requires the existence of "an actual prospective business opportunity."[56]

Plaintiffs argue that if the Court does not find the existence of valid contracts to support a tortious interference with existing contracts, at minimum, there was an interference with prospective business relations.[57] Plaintiffs make identical arguments for both Counts IV and V.

---

[53] *Bhole, Inc. v. Shore Investments, Inc.*, 67 A.3d 444, 453 (Del. 2013).
[54] *Id.*
[55] *Kable Products Services, Inc. v. TNG GP*, 2017 WL 2558270, at *10 (Del. Super. June 13, 2017).
[56] *Id.*
[57] Am. Compl. ¶ 221.

Plaintiffs argue that Intel induced Plaintiffs to "reach out to galleries, museums and other venues to host the Project" which resulted in Mr. Gersht entering into "binding oral agreements" at three art galleries to exhibit the Project upon its completion.[58] However, the Court notes that the Agreement anticipates this scenario. The Plaintiffs were under an existing contractual obligation under the Agreement to utilize its connections in the art industry to find venues for the Project. The Statement of Work states:

> [Plaintiffs] intends to support outreach to galleries and artistic community to secure locations for the Catalyst Phase, collaborating with members of Intel Studios team in the process. [Plaintiffs] intends to support all Intel distribution and promotional efforts through attendance at prioritized festivals and events, providing Press interviews and testimony.[59]

Plaintiffs contend that Intel "intentionally decided not to complete the Project for its own 'convenience'" despite Intel's "knowledge that its actions would interfere with the business opportunities already secured by, and those being pursued by [Plaintiffs]."[60] Plaintiffs do not sufficiently show that there were existing contracts, or an actual prospective business opportunity of which Intel intentionally and maliciously interfered with to cause damage to the Plaintiffs. While the Plaintiffs offer letters from art galleries as evidence confirming the cancellation of the plans to showcase the Project, the letters do not support Plaintiff's arguments that they equate to the existence of valid contracts necessary for tortious interference with a contract.

Even if the third-party contracts existed, or there was an actual prospective business opportunity for future contracts, Plaintiffs fail to show that Intel *intentionally* interfered with those ventures. This is a critical element for both claims. Intel's decision to shut down Intel Studios and terminate the Project with Plaintiffs is insufficient by itself to show actual intent to

---

[58] *Id.* ¶¶ 207 – 225.
[59] Agreement, Ex. A-1.
[60] Am. Compl. ¶¶ 207-225.

interfere with an existing or prospective contracts of Plaintiffs. Plaintiffs' claims that Intel "intentionally decided not to complete the Project for Intel's own "convenience" and despite knowledge that its actions would interfere with Plaintiffs' present and future business opportunities are conclusory statements not supported by evidence or fact.[61] As pled, Intel is acting "selfishly" and internally, and not externally with the intent to interfere with third-party arrangements with Plaintiffs. Furthermore, Intel alleges that Intel had no knowledge about the oral commitments made by Plaintiff to the art galleries, the existences of which were only shown after the Agreement was terminated.

At the hearing, Plaintiffs failed to demonstrate the specific terms of the purported oral contracts with the art galleries, whether Intel was aware of these contracts prior to the termination of the Agreement, actual injuries suffered because of Intel's termination aside from the $3 million conclusory alleged, and any further details necessary to ascertain the actual existence of the contracts or the prospective contract opportunities as Plaintiff claims. The Court therefore finds that Plaintiffs fail to state supportable claims in Counts IV and V.

### D. PLAINTIFFS HAVE FAILED TO PLEAD A VIABLE QUANTUM MERUIT IN COUNT VI.

A quantum meruit claim permits a party to "recover the reasonable value of his or her services if: (i) the party performed the services with the expectation that the recipient would pay for them; and (ii) the recipient should have known that the party expected to be paid."[62] "Courts generally dismiss claims for quantum meruit on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls."[63]

---

[61] Am. Compl. ¶¶ 212-213, 222-223.
[62] *Petrosky v. Peterson*, 859 A.2d 77, 79 (Del. 2004).
[63] *Albert v. Alex. Brown Management Services, Inc.*, 2005 WL 2130607, at *8 (Del. Ch. August 26, 2005).

Plaintiffs allege that Intel benefited from services performed by Plaintiffs for the Project.[64] Plaintiffs state that Plaintiffs made these expenditures in "advance."[65] Also, Plaintiffs assert that "Plaintiffs reasonably and foreseeably expected to be compensated for their services to Intel and to be reimbursed for any advanced funds."[66] Plaintiffs further plead that as Mr. Gersht is not a party to the Agreement, Mr. Gersht's services were made to Intel absent an express contract.[67] Plaintiffs argue that these allegations support a quantum merit claim.

The Court does not agree with Plaintiffs' arguments. The Agreement was a contractual venture between Gone and Intel, with clauses providing for an equal share of the profits from the venture.[68] Plaintiffs did not provide quasi-contractual services directly to Intel, but instead, performed as contractually obligated under the Agreement towards the mutual goal of completing the Project. Plaintiffs fail to show how Intel benefitted from Plaintiffs' services beyond the confines of the Agreement and the Project.

Plaintiffs make a final conclusory claim that Intel retained benefits from the Plaintiffs by being able to raise the value of Intel's volumetric imaging software to potential buyers to the detriment of the Plaintiffs. Plaintiffs, however, offer no factual support for this argument.[69] Intel never sold Intel Studios or the volumetric imaging software after the termination of the Agreement.[70]

Additionally, the Plaintiffs contend that they advanced funds for the Project to the benefit of Intel is also unsupported by any evidence on the record. Moreover, this contention overlooks the Costs and Expenses clause in the Agreement, stating: "[E]ach Party is responsible for its own

---

[64] Am. Compl. ¶¶ 230-32.
[65] *Id.*
[66] *Id.*
[67] Pls.' Answering Br. at 4.
[68] Agreement § 3.2.
[69] Am. Compl. ¶ 234.
[70] *Id.* ¶ 132.

Budget and all costs and expenses related to performing under this Agreement . . ."[71] The Agreement also provided the Plaintiffs with $108,000 from Intel on or before December 30, 2019 as compensation for any fees or costs incurred by the Plaintiffs for the Project.[72]

Furthermore, the Court cannot agree with the claim that Mr. Gersht is not a party to the Agreement. While the Agreement does identify the parties as Intel Services Division, LLC and Gone GB Ltd, Mr. Gersht signed the Agreement under his own name for Gone, and personally performed Gone's contractual obligations under the Agreement. While not a named party to the Agreement, at minimum, Mr. Gersht is an agent of Gone—i.e., working "on behalf of Gone GB LTD."[73] The Agreement controls and Mr. Gersht cannot act as if he is a stranger to the Agreement.

### E. THE COURT WILL DISMISS COUNT VII AS FAILING TO STATE A CLAIM FOR CONVERSION.

Conversion is the act of dominion wrongfully exerted over the property of another, in denial of the plaintiff's right, or inconsistent with it.[74]

Plaintiffs allege that they owned or had the right to possess the property stored within Intel's "Unique Electronic Production Environment" servers, and Intel, with bad intent, "wrongfully deleted, destroyed, altered, or otherwise rendered useless, and also otherwise retained such property."[75] Plaintiffs also contend that Intel "violated an independent duty to Mr. Gersht by destroying his authored works."[76] Plaintiffs concede that Intel, at Intel's cost, sent all

---

[71] Agreement § 3.1
[72] Defs.' Motion for PJP 15.
[73] Agreement § 2.2.
[74] *Kuroda v. SPJS holdings, LLC*, 971 A.2d 872, 889 (Del. Ch. 2009).
[75] Am. Compl. ¶ 238.
[76] Pls.' Answering Br. at 10.

the data files created during the Project to the Plaintiffs, but argues that without the use of Intel's proprietary software to convert the files to useable images, the data files are useless.[77]

Plaintiffs fail to show how Intel wrongfully exerted dominion over the Plaintiffs' property or define exactly what the "property" is in context of the conversion claim. Plaintiffs' arguments seems to be that by no longer permitting Plaintiffs to utilize Intel's proprietary software, Intel effectively appropriated Plaintiffs' right to continue using Intel's software to complete the Project. While Plaintiffs did have access and usage of Intel's proprietary software during the duration of the Agreement, this "right" divested at the time Intel terminated the Agreement.

The Court finds that Plaintiffs have failed to demonstrate that Intel wrongfully exerted control over or otherwise converted Plaintiffs' property. As such, the Court finds that Plaintiffs fail to sufficiently plead for a Conversion claim.

F.  **PLAINTIFFS HAVE FAILED TO PLEAD A VIABLE CLAIM FOR UNJUST ENRICHMENT AND RESTITUTION.**

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[78] A claim for unjust enrichment is unavailable if "there is a contract that governs the relationship between the parties that gives rise to the unjust enrichment claim."[79]

Plaintiffs' arguments on Count VIII are like those made in support of Count VI. Plaintiffs maintain that Plaintiffs performed services and advanced funds to the benefit of Intel between 2018 and 2020, and that Intel was unjustly enriched by accepting these benefits and the Plaintiffs were damaged to the amount of $3 million as a result.

---

[77] Am. Compl. ¶ 239.
[78] *In re Verizon Insurance Coverage Appeals*, 222 A.3d 566, 577 (Del. 2019).
[79] *Kuroda*, 971 A.2d at 891.

Plaintiffs fail to provide any supporting facts or evidence to buttress their arguments and alleges only conclusory statements. Plaintiffs make no attempt to explain how Intel was enriched. Plaintiffs only state that Plaintiffs' work enhanced the value of Intel's technology. There is no factual allegation to suggest that this occurred, as Intel never sold the technology of Intel Studios to another party. Moreover, Plaintiffs do not allege any facts that show the purported increase in value of Intel's technology stemming from the Plaintiffs' services and work. Plaintiffs cannot seek restitution for a benefit that Plaintiffs cannot quantify or identify on the pleadings. Moreover, the Agreement governs the relationship between the parties and makes restitution and unjust enrichment claims unavailable.

G.    THE LIMITATION OF LIABILITY CLAUSE IS APPLICABLE

The parties dispute the applicability of the Limitation of Liability clause. This clause provides:

> Types of Damages. Except for obligations under Section 10 (Indemnity) and breach of Section 7 (Confidentiality) and the CNDA, for which no limitations apply, [Plaintiffs] and Intel will have no liability to each other for any damages arising from loss of profits, loss of business, or loss of good will, or for any indirect, incidental, special, punitive, exemplary, or consequential damages, in any way arising out of or related to this Agreement or the Work, however caused.

> Total Liability. Except for obligations under Section 10 (Indemnity) and breach of Section 8 (Confidentiality) and the CNDA, for which no limitations apply, each Party's maximum aggregate, cumulative liability to the other relating to this Agreement will not exceed $50,000.

> Intent. The Parties intend that these limitations of liability will apply to the maximum extent permitted by applicable law. The Parties also intend that these limitations will apply even if their application causes any remedy to fail of its essential purpose.

Plaintiffs contend that Sections 12.2 and 12.4 create ambiguity on the application of Section 11 in cases where the Agreement was terminated without cause and with bad faith. Plaintiffs rely on Section 12.4's language, "A Party's right to terminate this Agreement is not an

18

exclusive remedy. The Parties have all other remedies at law or in equity available whether or not this Agreement is terminated"[80] to argue that this clause clashes with Section 11, and denotes that Plaintiffs are afforded additional remedies beyond the $50,000 limit as per Section 11.2.

The Court finds there is no ambiguity as to the applicability of Section 11. When Section 12.4 is read within the context of the entirety of Section 12, it can only be reasonably interpreted as providing additional remedies to the non-breaching party if the non-breaching party terminated the Agreement after a breach. Section 12.2 reads:

> In addition to any other remedies under this Agreement, or as may be available at law or in equity, either Party may terminate this Agreement for cause if the other Party materially breaches this Agreement and fails to cure such breach within thirty (30) days after receiving written notice from the non-breaching Party of the breach. If the breach is incurable, the non-breaching Party may terminate immediately without granting the breaching Party any cure period.

Plaintiffs rely on Intel's termination of the Agreement as a *breach*, but that is not the case here. Intel's decision to terminate the Agreement did just that—it terminated the Agreement. Plaintiffs do not provide evidence that Intel breached any part of the Agreement during the time the Agreement was in force, and Plaintiffs' arguments that Intel acted in bad faith by misinforming the Plaintiffs of the pending Intel Studios shut down is not persuasive or supported by evidence. Section 12 does not create any ambiguity to the application of Section 11.

The Limitation of Liability clause is clear on its face: the parties agreed to limit the amount recoverable for actual, direct damages arising out of or related to the Agreement or the Project. Only breaches of the Indemnity and Confidentiality clause of the Agreement have no limits for liability. If the parties intended to exclude the possibility of a termination of the Agreement from the $50,000 limitation, the parties would have agreed as such in the Agreement.

---

[80] Agreement § 12.4.

## VI.    CONCLUSION

For the reasons stated above, the Court **GRANTS** the Motion and **DISMISSES** Counts I, III, IV, V, VI, VII, and VIII.  In addition, the Court holds that the Limitation of Liability clause is enforceable.

December 8, 2022
Wilmington, Delaware

/s/ Eric M. Davis
Eric M. Davis, Judge

cc: File&ServeXpress

20