# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STRAINE DM HOLDINGS LLC, | ) | |
| | ) | |
| Plaintiff/Counterclaim | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. N24C-02-049 VLM CCLD |
| | ) | |
| ROBERT BREAULT, D.M.D., | ) | |
| | ) | |
| Defendant/Counterclaim | ) | |
| Plaintiff. | ) | |

## MEMORANDUM OPINION

Submitted: October 22, 2024
Decided: January 22, 2025

*Upon Consideration of Straine DM Holdings, LLC's Motion to Dismiss,*
**DENIED.**

Travis S. Hunter, Esquire (Argued), and Jessica E. Blau, Esquire, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, and Brandon C. Hubbard, Esquire, Max A. Aidenbaum, Esquire, DICKINSON WRIGHT PLLC, Lansing, Michigan, *Attorneys for Plaintiff/Counterclaim Defendant Straine DM Holdings LLC.*

R. Joseph Hrubiec, Esquire (Argued), of POST & SCHELL, P.C., Wilmington, Delaware, and Alfred DiVincentis, Esquire, of HALLORAN SAGE LLP, Hartford, Connecticut, *Attorneys for Defendant/Counterclaim Plaintiff Robert Breault, D.M.D.*

**Medinilla, J.**

# I.    INTRODUCTION

This dispute arises from a long-term business relationship between a dental consulting firm and a practicing dentist, culminating in a failed transaction to acquire a local dental practice.  The firm brought this action against the dentist seeking claims for breach of contract.  The dentist countered asserting breach of oral contract and detrimental reliance based on the firm's alleged promises to employ him as an executive in its newly formed company.

The firm moved to dismiss the dentist's counterclaims under Superior Court Civil Rule 12(b)(6) arguing the dentist fails to state claims for breach of contract and detrimental reliance.  As to the former, the firm argues dismissal is warranted because the alleged promises constitute an unenforceable agreement to agree, is barred by the parol evidence rule and statute of frauds, and the executive role promised upon closing the acquisition transaction was an unsatisfied condition precedent.  As to the latter, the firm argues the dentist fails to allege a reasonably definite and certain promise to support his detrimental reliance claim.  For the reasons below, the firm's Motion to Dismiss is **DENIED.**

## II.     FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. PARTIES

Counterclaim Plaintiff/Defendant Robert Breault, D.M.D. is a resident of the state of South Carolina.[2]  He owns and operates Cromwell Family Dental ("CFD") located in Cromwell, Connecticut.[3]

Counterclaim Defendant/Plaintiff Straine DM Holdings LLC ("SDM")[4] is a Delaware limited liability company.[5]  Prior to the events at issue, SDM operated solely as a national dental consulting and management services firm.[6]

### B. FACTUAL BACKGROUND

#### 1.  The Parties' Initial Relationship

The parties' relationship began when Dr. Breault engaged SDM's consulting services for CFD between 2006 and 2007.[7]  In 2017, SDM developed plans to transition from a dental consulting entity into a dental services organization ("DSO")

---

[1] The facts contained herein are taken from the allegations made in Defendant Robert Breault, D.M.D.'s Answer to Plaintiff's Complaint with Affirmative Defenses and Counterclaim ("Countercl.") and are assumed to be true for purposes of this Motion to Dismiss. D.I. 7.

[2] *Id.* ¶ 1.

[3] *Id.*

[4] *Id.* ¶ 2. Previously known as Straine Dental Management.

[5] *Id.*

[6] *Id.* ¶ 4.

[7] Countercl. ¶ 3.

that would acquire the non-clinical assets of various dental practices.[8] This initiative led to several formal agreements with CFD.[9] Through these subscription agreements, Dr. Breault became a member of SDM under a limited liability agreement dated June 20, 2017.[10]

## 2. The Chief Clinical Officer Position and Alleged Promises

Prior to 2018, Dr. Breault began serving as SDM's Chief Clinical Officer ("CCO") at the request of Kerry Straine, SDM's CEO.[11] Per Dr. Breault, K. Straine repeatedly promised that Dr. Breault would formally join SDM as CCO when the initial closing of practice acquisitions occurred.[12] In representations to other dental practices, K. Straine regularly represented Dr. Breault as part of the "SDM Team" and its CCO.[13]

Dr. Breault further alleges that K. Straine made several specific representations regarding compensation and benefits, including alleged promises that if Dr. Breault proceeded with the transaction, he would be "flying first class,"

---

[8] *Id.* ¶ 5.

[9] *Id.* ¶ 6. These agreements include: (1) a Services Agreement effective January 1, 2018; (2) a Subscription Agreement for Class B Membership Units (2 Units for $20,000); and (3) a Subscription Agreement for Class D Membership Units (0.25 Units for $2,500).

[10] *Id.*

[11] Defendant-Counter-Plaintiff's Answering Brief In Opposition to Plaintiff-Counter-Defendant's Motion to Dismiss at 1, D.I. 19 ("Answer Br.").

[12] Countercl. ¶ 9.

[13] *Id.* ¶ 11.

and his investment would be worth approximately $15 million dollars.[14]  Per Dr. Breault, K. Straine represented that payment would come through multiple channels: the sale of CFD to SDM, additional capital events, the CCO salary, management performance bonuses, and finder's fees for recruiting additional practices.[15]

### 3. The Letters of Intent and Failed Transaction

In late 2019, when SDM believed it had enough practices under service agreements to seek a capital event, it delivered its initial letter of intent ("First LOI") to participating practices, including CFD.[16]  This LOI contained a two-year exclusivity period during which practices were prohibited from engaging in discussions about competing transactions.[17]  While the terms of the potential capital event were being fine-tuned and revised, on May 13, 2021, SDM required all practices to execute an amended letter of intent ("Second LOI").[18]

The Second LOI contained specific provisions regarding employment terms. Section 10 reflects Dr. Breault "would enter into an employment agreement with [SDM]" and specified several terms, including: compliance requirements, compensation terms, an employment term of three or five years, benefits, and non-

---

[14] *Id.* ¶ 18.

[15] *Id.* ¶ 19.

[16] *Id.* ¶ 12.

[17] *Id.* ¶ 13.

[18] Countercl. ¶ 20; *see* D.I 15 Ex. A ("Second LOI").

competition/non-solicitation/non-disclosure obligations.[19] Notably, the Second LOI included an integration clause stating:

> This Letter of Intent, including by reference the Service Agreement, contains the entire agreement between the parties hereto concerning the matters addressed herein, and supersedes all prior oral or written agreements, understandings, representations and warranties, and courses of conduct and dealing between the parties related to this Transaction. No modification of this Letter of Intent or waiver of the terms and conditions hereof would be binding upon any party hereto, unless approved in writing by each party.[20]

The Second LOI also explicitly stated it was non-binding except for certain enumerated provisions:

> Except with respect to Sections 13, 15, 16, 18, 19, 20 and 21 of this Letter of Intent, which are intended to be binding between the parties, this Letter of Intent is a non-binding expression of the parties' intentions and does not create legally binding obligations between the parties with respect to this Transaction or otherwise impose any obligations on the parties. . . .[21]

Dr. Breault's unique situation complicated negotiations. Unlike other practice owners, Dr. Breault resided in South Carolina and managed CFD remotely, primarily practicing dentistry at another location.[22] When the LOIs were presented, Dr. Breault raised concerns about how his arrangement would be addressed, particularly

---

[19] Second LOI § 10.

[20] *Id.* § 21.

[21] *Id*. § 20.

[22] Countercl. ¶ 14.

his employment at CFD and his promised CCO role.[23]  K. Straine allegedly assured Dr. Breault that these concerns would be addressed in the definitive documents.[24]  In reliance on those assurances, Dr. Breault continued to act as the CCO, made presentations to various lending institutions and investors regarding the DSO,[25] and executed the Second LOI.[26]

Transaction negotiations intensified between late 2021 and early 2022.  On October 22, 2021, CFD received the first set of transaction documents, including a draft Asset Purchase Agreement ("APA")[27] and, in January 2022, a tailored Executive Employment Agreement for the CCO position.[28]  Dr. Breault identified and communicated several concerns with the proposed documents.[29]

The relationship soured when SDM allegedly changed the transaction structure and made new demands.[30]  On February 11, 2022, SDM transmitted a revised APA that unexpectedly removed the Executive Employment Agreement for

---

[23] *Id.* ¶¶ 14–15.

[24] *Id.* ¶¶ 16, 21.

[25] *Id.* ¶ 17.

[26] *Id.* ¶ 22.

[27] *Id.* ¶ 24.

[28] Countercl. ¶¶ 36–37.

[29] *Id.* ¶¶ 38–41.

[30] *Id.* ¶¶ 46–48. During a February 9 call, Dr. Breault for the first time learned that SDM changed the transaction structure.  The next day, during a conference call with K. Straine and counsel, new demands emerged, including requiring Dr. Breault to share proceeds with his dentist employees.

the CCO role.[31]  As such, Dr. Breault declined to proceed with the transaction.[32] SDM accepted his decision the following day.[33]

## C. SUBSEQUENT LITIGATION AND PRESENT ACTION

After the failed transaction, SDM sent Dr. Breault a Membership Unit Redemption and Mutual Release ("Release"), which he declined to execute.[34]  Dr. Breault then made a books and records demand on April 1, 2022 seeking to determine the value of his interest in SDM.[35]  When SDM refused the demand asserting Dr. Breault was no longer a member, he initiated a books and records action.[36]

On November 3, 2022, the Court of Chancery determined Dr. Breault remained a member of SDM.[37]  Our Supreme Court affirmed this judgment on September 28, 2023.[38]

---

[31] *Id.* ¶ 53.

[32] *Id.* ¶¶ 54–56.

[33] *Id.* ¶ 57.

[34] Countercl. ¶ 58.

[35] *Id.* ¶ 59.

[36] *Id.* ¶¶ 59–60; C.A. No. 2022-0410 JTL.

[37] Countercl. ¶ 63.

[38] *Id.* ¶ 65.

SDM then filed this action for breach of contract.[39]  In response, Dr. Breault asserted counterclaims for (1) breach of oral contract and (2) detrimental reliance.[40]  SDM promptly moved to dismiss.[41]  The motion has been fully briefed, the Court heard oral arguments, and this matter is now ripe for decision.

## III.  STANDARD OF REVIEW

Upon a motion to dismiss under Rule 12(b)(6), the Court (i) accepts all well-pled factual allegations as true, (ii) accepts even vague allegations as well-pled if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[42]  The Court does not, however, accept "conclusory allegations that lack specific supporting factual allegations."[43]  But "it is appropriate . . . to give the pleader the benefit of all reasonable inferences that can be drawn from its pleading."[44]

---

[39] *See generally* Complaint, D.I. 1.

[40] Countercl. ¶¶ 66–78.

[41] *See generally* Plaintiff's Motion to Dismiss the Defendant's Counterclaim, D.I. 15.

[42] *See ET Aggregator, LLC v. PFJE AssetCo Hldgs. LLC*, 2023 WL 8535181, at *6 (Del. Super. Dec. 8, 2023).

[43] *Id.* (quoting *Ramunno v. Crawley*, 705 A.2d 1029, 1034 (Del. 1998)).

[44] *TrueBlue, Inc. v. Leeds Equity Partners IV, LP*, 2015 WL 5968726, at *2 (Del. Super. Sept. 25, 2015) (quotation omitted).

## IV.   DISCUSSION

### A. THE BREACH OF ORAL CONTRACT CLAIM SURVIVES

"[T]o survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[45]  "In alleging a breach of contract claim, a plaintiff need not plead specific facts to state an actionable claim. . . .  Rather, the plaintiff need only allege facts that, if true, state a claim upon which relief can be granted."[46]  "Whether an oral contract exists is a question of fact."[47]

Delaware follows the objective theory of contracts—"a contract's construction should be that which would be understood by an objective, reasonable third party."[48]  The material terms must also be clear for the Court to enforce the contract,[49] which are determined on a "case-by-case basis, depending on the subject

---

[45] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).  *See also Clouser v. Marie*, 2022 WL 453551, at *4 (Del. Super. Feb. 14, 2022), *aff'd*, 285 A.3d 839 (Del. 2022) (TABLE) (citing *Levy Fam. Invs., LLC v. Oars + Alps LLC*, 2022 WL 245543, at *9 (Del. Ch. Jan. 27, 2022) (explaining a breach of contract claim must show that: "(1) a contract existed between the parties; (2) the defendant breached an obligation imposed by the contract; and (3) the plaintiff suffered damages as a result of the breach")).

[46] *VLIW Tech.*, 840 A.2d at 611.

[47] *Haart v. Scaglia*, 2022 WL 3108806, at *16 n.210 (Del. Ch. May 26, 2022) (citing *Cole v. State*, 922 A.2d 354, 359 (Del. 2005)).

[48] *CPC Mikawaya Hldgs., LLC v. MyMo Intermediate, Inc.*, 2022 WL 2348080, at *7 (Del. Ch. June 29, 2022) (quoting *Osborn ex. rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[49] *Id.* (citing *Hughes v. Frank*, 1995 WL 632018, at *3 (Del. Ch. Oct. 20, 1995)).

matter of the agreement and on the contemporaneous evidence of what terms the parties considered essential."[50]

SDM challenges whether Dr. Breault stated an actionable oral contract claim on several fronts. First, Dr. Breault alleges an unenforceable agreement to agree.[51] Second, closing the acquisition transaction is an unsatisfied condition precedent and the prevention doctrine is inapplicable.[52] Third, that the parol evidence rule bars oral representations that contradict the Second LOI.[53] And finally, that the statute of frauds bars the oral contract claim because the alleged agreement could not be performed within one year.[54] Despite SDM's efforts to thwart the counterclaim, its challenges do not warrant dismissal, especially since the crux of the issues presented are factual questions better suited for a later stage.

Dr. Breault meets his burden by averring that a contract between SDM and him existed, that K. Straine repeatedly promised him the position of CCO but ultimately abandoned such promises, and Dr. Breault suffered damages therefrom.

---

[50] *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1230 (Del. 2018) (citing *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1097 (Del. Ch. 1986)).

[51] *See* Opening Brief in Support of Plaintiff's Motion to Dismiss Defendant-Counter-Plaintiff's Counterclaim at 7–10, D.I. 14 ("Opening Br.").

[52] *Id.* at 10–14; Reply Brief in Support of Plaintiff's Motion to Dismiss Defendant Counter-Plaintiff's Counterclaim at 4–6, D.I. 20 ("Reply Br.").

[53] Opening Br. at 14–17.

[54] Reply Br. at 7–8.

Such well-pled allegations, through a light in favor of Dr. Breault, are sufficient to survive a motion to dismiss.

### 1. The Alleged Oral Promise is a Type II Preliminary Agreement.

The first question raised by the breach of contract claim is whether an enforceable agreement exists. Delaware law permits parties to agree to make future contracts.[55] Traditionally, a lack of material terms generally rendered an agreement unenforceable.[56] But Delaware now recognizes two types of enforceable preliminary agreements.[57]

Type I agreements reflect a consensus on all points requiring negotiation but indicate the parties' desire to memorialize the agreement in a more formal document.[58] These agreements are fully binding.[59] Type II agreements exist where parties "agree on certain major terms, but leave other terms open for future negotiation."[60] Unlike Type I agreements, which commit parties to their ultimate contractual objective, Type II agreements obligate parties to negotiate the open

---

[55] *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 761 (Del. 2022) (citations omitted).

[56] *Id.* (citing *Hindes v. Wilm. Poetry Soc.*, 138 A.2d 501, 503 (Del. Ch. 1958)).

[57] *Id.* (citing *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 349 and n.82 (Del. 2013) [hereinafter *SIGA*]).

[58] *Id.*

[59] *Id.* (citing *SIGA*, 67 A.3d at 349).

[60] *Id.* (quoting *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998)).

issues in good faith.[61] To be sure, a lack of an express good faith obligation does not hinder the Court's ability to consider the LOI as a preliminary agreement.[62] "Type II preliminary agreements *are* binding and enforceable contracts."[63] Put differently, an "agreement to agree is not fully binding on the open terms yet to be negotiated; but the parties are bound to negotiate those open terms in good faith."[64]

SDM asserts Dr. Breault fails to allege the existence of either a Type I or Type II enforceable preliminary agreement because he failed to identify material terms of the purported oral employment contract—specifically the CCO position.[65] In SDM's view, Dr. Breault's allegations amount to nothing more than an unenforceable agreement to agree, "at most."[66] Dr. Breault maintains the parties reached more than preliminary agreements and formed a binding agreement.[67] The parties, while close, miss the mark.

SDM mischaracterizes the oral contract as an unenforceable agreement to agree. Since Type II preliminary agreements are binding and enforceable as to

---

[61] *Cox*, 273 A.3d at 761 (citing *SIGA*, 67 A.3d at 349).

[62] *Greentech Consultancy Co., WLL v. Hilco IP Servs., LLC*, 2022 WL 1499828, at *13 (Del. Super. May 11, 2022).

[63] *Id.*

[64] *Matter of Est. of Landon*, 2023 WL 5533132, at *3 (Del. Ch. Aug. 28, 2023) (citing *SIGA*, 67 A.3d at 349).

[65] Opening Br. at 8–10; Reply Br. at 2–4.

[66] Reply Br. at 3.

[67] Answer Br. at 22–23.

negotiating open terms in good faith, it is enough that the parties agree to certain major terms while leaving others open for future negotiation. And such talks must be done in good faith.

Drawing all reasonable inferences in Dr. Breault's favor, his claim survives the dismissal stage. He alleges the parties agreed on major terms—namely, that he would serve as CCO of the transformed DSO in exchange for his immediate service and assistance with transformation efforts. He alleges he served as CCO, made investor presentations, and tested strategic partnerships through CFD.[68] That essential terms like compensation remained open for negotiation does not render his claim legally deficient at the pleading stage.

Indeed, Dr. Breault's allegations demonstrate that essential terms remained open for negotiation. He acknowledges receiving draft employment agreements in January 2022, identified "significant issues" with the proposed terms,[69] and understood his role would be "addressed with the drafting of definitive documents."[70] Dr. Breault points to his existing CCO role and representation of payment including the CCO salary, management performance bonuses, finder's fees,[71] which serves to underscore that material compensation terms remained

---

[68] Countercl. ¶¶ 11, 17.

[69] *Id.* ¶ 38.

[70] *Id.* ¶ 21.

[71] *Id.* ¶ 19.

undefined.  The parties proceeding to negotiate specific employment terms reflects an understanding that further agreement was required.  Thus, this is a Type II preliminary agreement.

"The consequences of Type II preliminary agreements are straightforward: they do not bind parties to anything more than 'the obligation to negotiate the open issues in good faith . . . within the agreed framework.'"[72]  "Indicia of bad faith include 'renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.'"[73]  Here, Dr. Breault alleges that in February 2022, SDM abruptly changed the transaction's entire structure without explaining its impact on members, demanded he share proceeds with his dentist employees as a new closing condition, and then removed the CCO position from the transaction documents.[74]  Accepting these allegations as true, it is reasonably conceivable that SDM breached its duty to negotiate in good faith.  Indeed, SDM's alleged conduct during final negotiations—after months of drafting employment agreements and just days before the February 11 signing deadline—establishes plausible bad faith conduct.

---

[72] *Cox*, 273 A.3d at 762 (citing *SIGA*, 67 A.3d at 349 and n.82)).

[73] *Greentech*, 2022 WL 1499828, at *14 (citing *SIGA*, 67 A.3d at 349 n.85).

[74] Countercl. ¶¶ 46, 48, 53.

In sum, taking all well-pled allegations as true and drawing reasonable inferences in Dr. Breault's favor, whether SDM breached this obligation is a factual question that cannot be resolved at this juncture.[75] This question is "best reserved for the more textured presentation of witnesses and exhibits at trial."[76]

**2. Closing The Transaction Was a Condition Precedent, But the Prevention Doctrine Is Applicable.**

The second issue is whether closing the transaction is an unsatisfied condition precedent and whether the prevention doctrine applies. "A condition precedent is an act or event, other than a lapse of time, that must exist or occur *before* a duty to perform something promised arises."[77] Delaware courts generally disfavor conditions precedent "because of their tendency to work a forfeiture."[78] Whether the provision qualifies as a condition precedent is a matter of law.[79] "The Court examines whether the parties intended for a provision to act as a condition precedent by looking to the plain language of the provision."[80] A condition precedent must be clear and unambiguous, "though no specific language is required."[81]

---

[75] *Greentech*, 2022 WL 1499828, at *1.

[76] *Id.* at *16.

[77] *Nucor Coatings Corp. v. Precoat Metals Corp.*, 2023 WL 6368316, at *11 (Del. Super. Aug. 31, 2023) (citing *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *25 (Del. Super. July 29, 2021)).

[78] *Id.* (citations omitted).

[79] *Id.*

[80] *Id.* (citing *Ainslie v. Cantor Fitzgerald, LP*, 2023 WL 106924, at *10 (Del. Ch. Jan. 4, 2023)).

[81] *Id.* (citing *Aveanna Healthcare*, 2021 WL 3235739, at *25).

16

Here, SDM argues no obligation to employ Dr. Breault ever arose because a condition precedent remained unsatisfied.[82]  True, the CCO role turned on the deal closing.  But parties cannot profit from their misconduct.

The prevention doctrine provides that "where a party's breach by nonperformance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused."[83]  "A breach 'contributed materially' to the non-occurrence of a condition if the conduct made satisfaction of the condition less likely."[84]  In other words, "a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent."[85]  This means that an "analysis whether performance may have been 'wrongfully prevented' can stand apart from the exercise of a termination right."[86]

---

[82] Opening Br. at 13.

[83] *Snow Phipps Gp., LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *52 (Del. Ch. Apr. 30, 2021) (citing *Restatement (Second) of Contracts* § 245 (1981)).  *See also Murphy Marine Servs. of Del., Inc. v. GT USA Wilm., LLC*, 2022 WL 4296495, at *12–13 (Del. Ch. Sept. 19, 2022) (finding a failed condition precedent did not excuse performance).

[84] *Snow Phipps Gp., LLC*, 2021 WL 1714202, at *52 (quoting *In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *91 (Del. Ch. Aug. 31, 2020) and citing *WaveDivision Hldgs., LLC*, 2010 WL 3706624, at *14 (Del. Ch. Sept. 17, 2010)).

[85] *BitGo Hldgs., Inc. v. Galaxy Digit. Hldgs., Ltd.*, 319 A.3d 310, 333 (Del. 2024) (quoting *Mobile Commc'ns Corp. of Am. V. Mci Commc'ns Corp.*, 1985 WL 11574, at *4 (Del. Ch. 1985)).

[86] *Id.*

Dr. Breault alleges the closing never occurred due to K. Straine and SDM's wrongful conduct.[87]  Per SDM, the doctrine is inapplicable because Dr. Breault—not SDM—terminated the deal.[88]  SDM relies on *Matter of Est. of Landon* to support its proposition that "a contract claim may be subject to dismissal due to the non-occurrence of a condition precedent even where the complaining party had properly alleged a Type II preliminary agreement."[89]  That case is distinguishable where the Court considered a settlement agreement in the context of equitable conversion and those facts involved the conveyance of real property with no allegations of misconduct.[90]

Here, unlike *Landon*, the parties dispute the sole terminator of the deal. Looking at the facts in favor of Dr. Breault, the closing was a condition precedent, but SDM may have been the catalyst for his ultimate withdrawal.  Thus, the prevention doctrine is implicated by SDM's alleged wrongful pre-closing actions. Whether SDM's conduct materially contributed to the closing's failure—and the

---

[87] Answer Br. at 24.

[88] Reply Br. at 5.

[89] Opening Br. at 11 (citing *Matter of Est. of Landon*, 2023 WL 5533132, at *3).

[90] *See Matter of Est. of Landon*, 2023 WL 5533132, at *3.

subsequent non-hiring of Dr. Breault as CCO—is a fact-intensive inquiry that cannot be resolved on the present record.[91]

### 3. The Breach of Contract Claim Is Not Barred by the Parol Evidence Rule.

SDM further argues that Dr. Breault's contract claim is barred by the parol evidence rule. "The parol evidence rule bars the admission of evidence extrinsic to an unambiguous, integrated written contract for the purpose of varying or contradicting the terms of that contract."[92] "Delaware law holds that the parol evidence rule bars the admission of preliminary negotiations, conversations, and verbal agreements when the parties['] written contract represents the entire contract between the parties."[93] "If a written contract represents the entire agreement of the parties it is said to be 'integrated.'"[94] "Clauses indicating that the contract is an expression of the parties' final intentions generally create a presumption of

---

[91] *Cf. Larian as Tr. of Larian Living Tr. v. Momentus Inc.*, 2024 WL 386964, at *11 (Del. Super. Jan. 31, 2024) (denying summary judgment where the applicability of the prevention doctrine could not be decided at the pleading stage).

[92] *Galantino v. Baffone*, 46 A.3d 1076, 1081 (Del. 2012).

[93] *Trifecta Multimedia Hldgs. Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 470 (Del. Ch. 2024) (quoting *MicroStrategy, Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *13 (Del. Ch. Dec. 30, 2010)); *see also Galantino*, 46 A.3d at 1081 (citations omitted) ("The parol evidence rule bars the admission of evidence extrinsic to an unambiguous, integrated written contract for the purpose of varying or contradicting the terms of that contract.").

[94] *Carlson v. Hallinan*, 925 A.2d 506, 522–23 (Del. Ch. 2006) (citing II E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 7.3, at 225 (3d ed. 2004)).

integration."[95] "The presence of an integration clause is not conclusive, however, because the intent of the parties always controls."[96]

"[T]o apply the parol evidence rule, the Court first must decide whether the parties['] written contract was intended to be the final expression of their agreement, and second whether the alleged oral representations would contradict the written terms of the agreement."[97] Therefore, the question is whether the Second LOI constitutes a final agreement between the parties.

Yes and no. SDM notes that the Second LOI contained an integration clause prohibiting Dr. Breault from relying on prior oral agreements to contradict the terms therein.[98] Dr. Breault contends the parties' ongoing negotiations show the Second LOI was only partially integrated.[99] The latter argument is more persuasive.

The parties designated certain provisions of the Second LOI as binding to suggest the remainder of it was non-binding. Section 20 of the LOI—titled "Non-Binding Agreement"—reflects just that.[100] "[C]ommon sense suggests that parties to a sophisticated commercial agreement, let alone any agreement, would not intend

---

[95] *Addy v. Piedmonte*, 2009 WL 707641, at *9 (Del. Ch. Mar. 18, 2009) (citing *Carrow v. Arnold*, 2006 WL 3289582, at *5 (Del. Ch. Oct. 31, 2006)).

[96] *Carlson*, 925 A.2d at 523 (citation omitted).

[97] *Carrow*, 2006 WL 3289582, at *4.

[98] Opening Br. at 15–16.

[99] Answer Br. at 26–27.

[100] Second LOI § 20.

20

to be bound by an agreement that does not *address* all terms that they considered material and essential to that agreement . . . ."[101]  The agreed-upon conspicuous language includes:

- The following outlines a proposed transaction between [the parties]. . . .[102]

- Except for Sections 13, 15, 16, 18, 19, 20 and 21, th[e Second LOI] is non-binding and for discussion purposes. This Transaction . . . remains subject to accounting, tax, legal and regulatory compliance review and due diligence, along with the execution of the Definitive Agreements.[103]

- Please note, for the avoidance of doubt, the foregoing example is merely an illustration, does not utilize actual amounts that would be present in the Transaction and does not take into account certain items, expenses and/or adjustments that may arise during the Transaction.[104]

- The Purchase Price would be paid in [various forms and] such other items as may be agreed to by the parties.[105]

- Purchaser anticipates finalizing the terms of the Equity Consideration in the next phase of the process but would envision . . . collaborating in good faith in the next phase of the process to reach mutually agreeable minimum productivity-based thresholds . . . .[106]

- Owner would enter into an employment agreement with Purchaser . . . .[107]

---

[101] *Eagle Force Hldgs.*, 187 A.3d at 1230 (emphasis in original).

[102] Second LOI at 1.

[103] *Id.*

[104] *Id.* § 2.

[105] *Id.* § 3.

[106] *Id.* § 6.

[107] *Id.* § 10.

- For the avoidance of doubt, Owner will provide to the representatives of Purchaser the full opportunity to conduct and finalize standard due diligence in connection with this Transaction . . . .[108]

- The Exclusivity period may be extended by mutual agreement of the parties hereto.[109]

- Purchaser would need to complete customary legal, operational, financial and clinical/regulatory due diligence . . . to proceed with this Transaction.[110]

- We look forward to working with you on next steps and moving forward with this Transaction.[111]

This language suggests the parties anticipated later negotiations to reach mutually agreed upon terms through a definitive agreement. SDM's contention that the agreement was fully integrated is unavailing. The Court finds the Second LOI was not fully integrated; thus, the parol evidence rule does not apply.

### 4. The Breach of Contract Claim Is Not Barred by the Statute of Frauds.

The final question raised by the breach of contract claim is whether the statute of frauds bars the alleged oral contract claim. In Delaware, the statute of frauds "prohibits an action from being brought based on an 'agreement that is not to be performed within the space of 1 year from the making thereof . . . unless the contract

---

[108] Second LOI § 12.

[109] *Id.* § 13.

[110] *Id.* § 2.

[111] *Id.* at 10.

is reduced to writing . . . signed by the party to be charged therewith.'"[112] It is settled that the statute "does not apply to a contract which may, by any possibility, be performed within a year."[113] A contract that contains a "good cause" termination clause "allows for a contract with an indefinite term to be performed within one year."[114] It follows that if an alleged oral contract for employment is capable of completion in less than one year, it is not within the statute of frauds.[115]

SDM avers the statute of frauds bars the alleged oral contract claim.[116] Dr. Breault disagrees.[117] True, the Second LOI designates Dr. Breault's potential employment for a "term of 3 or 5 years . . . ."[118] But that compensation provision was not among the sections intended to be binding between the parties. Further, Dr. Breault alleges that in February 2022, he raised concerns about the termination

---

[112] *World Class Wholesale, LLC v. Star Indus., Inc.*, 2018 WL 2331991, at *1 (Del. Super. May 22, 2018) (citing 6 *Del. C.* § 2714).

[113] *Haveg Corp. v. Guyer*, 211 A.2d 910, 912 (Del. 1965) (citing *Devalinger v. Maxwell*, 54 A. 684, 686 (Del. 1903)).

[114] *World Class*, 2018 WL 2331991, at *2 (citing *Brandner v. Del. State Hous. Auth.*, 605 A.2d 1, 2 (Del. 1991)).

[115] *Brandner*, 605 A.2d at 3.

[116] Opening Br. at 16–17; Reply Br. at 7–8.

[117] Answer Br. at 28–29.

[118] Opening Br. at 16–17 (citing Second LOI § 10(vi)).

agreement outlined in the draft documents.[119]  SDM responded: "if SDM wanted to fire Dr. Breault, they would find a way to make that firing for cause."[120]

That statement demonstrates a "good cause" termination clause which allows a contract with indefinite terms to be performed within one year.  Again, the Second LOI left open essential terms for further consideration, including Dr. Breault's role with the new entity.  At this stage, looking at the facts in favor of Dr. Breault, if SDM expressed it could fire him for cause, the statute of frauds does not prevent enforcement of the agreement.  This dispute is better served through further discovery or trial where the facts can be gleaned and the credibility of all involved can be adjudged.

## B. THE *PROMISSORY ESTOPPEL* CLAIM SURVIVES[121]

To state a claim of *promissory estoppel*, a plaintiff must establish: (1) a promise was made; (2) it was reasonable to expect the promise would induce action or forbearance; (3) the promisee reasonably relied on the promise and took action or forbearance; and (4) the promise is binding because injustice can be avoided only by

---

[119] Countercl. ¶ 49.

[120] *Id.*

[121] Count II in Dr. Breault's counterclaim asserts a cause of action for detrimental reliance, which is later clarified as detrimental reliance/*promissory estoppel* in the pleading. *See* Answer Br. at 29.

24

enforcement of the promise.[122] The doctrine's purpose is "to prevent injustice," and serves essentially as a substitute for consideration where no contract exists.[123]

SDM argues Dr. Breault's detrimental reliance claim fails to establish the first and third elements: (1) he fails to allege the existence of a reasonably definite and certain promise that included essential terms of employment, and (2) any purported reliance on the alleged promises was unreasonable given the contingent nature of the transaction.[124] Neither argument warrants dismissal.

### 1. The Promise Was Sufficiently Definite and Certain.

"*Promissory estoppel* requires 'a real promise, not just mere expressions of expectation, opinion, or assumption.'"[125] The Court considers factors including the content, manner, and frequency of such assurances.[126] The promise must also be reasonably definite and certain.[127]

Accepting the well-pled allegations as true, K. Straine's promises went beyond mere expressions of expectation. K. Straine repeatedly assured Dr. Breault that he would receive formal employment as CCO when the initial closing

---

[122] *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000).

[123] *Windsor I, LLC v. CW Cap. Asset Mgmt. LLC*, 238 A.3d 863, 876 (Del. 2020); *Chrysler Corp. v. Chaplake Hldgs., Ltd.*, 822 A.2d 1024, 1034 (Del. 2003).

[124] Opening Br. at 17–20.

[125] *James Cable, LLC v. Millennium Digit. Media Sys., L.L.C.*, 2009 WL 1638634, at *5 (Del. Ch. June 11, 2009) (citation omitted) (italics added).

[126] *Konitzer v. Carpenter*, 1993 WL 562194, at *7 (Del. Super. Dec. 29, 1993).

[127] *Hyetts Corner, LLC v. New Castle Cty.*, 2021 WL 4166703, at *9 (Del. Ch. Sept. 14, 2021).

occurred.[128] This was not a vague aspiration—SDM actively held Dr. Breault out as its CCO in presentations to potential investors and industry partners, regularly representing him as part of the "SDM team" and its CCO.[129] The delivery of a draft Executive Employment Agreement on January 24, 2022 further evidences the definite nature of these promises.[130]

Notably, Dr. Breault had already been serving as CCO years before the parties entered the Second LOI.[131] The promise cannot be viewed in a vacuum.[132] It is reasonably conceivable that Dr. Breault detrimentally relied on K. Straine's representations that SDM would present a formal contract for the CCO position after the Second LOI.[133] This existing role provides important context—Dr. Breault was not seeking a new position but rather the formalization of responsibilities he was already performing at K. Straine's request. At this stage, these allegations sufficiently establish reasonably definite and certain promises.

---

[128] Countercl. ¶ 9.

[129] *Id.* ¶¶ 11, 19.

[130] *Id.* ¶ 37.

[131] *Id.* ¶ 8.

[132] *Konitzer*, 1993 WL 562194, at *9.

[133] Countercl. ¶ 8.

## 2. Dr. Breault's Reliance Was Reasonable Under the Circumstances.

Lastly, SDM contends that Dr. Breault could not have reasonably relied on the promise.[134] Specifically, that the commercial context of the underlying transaction precludes reasonable reliance as a matter of law.[135] This argument, while potentially relevant at a later stage, cannot support dismissal.

Dr. Breault's reliance on *Lord v. Peninsula United Methodist Homes, Inc.* is more persuasive.[136] There, the Court declined to dismiss a *promissory estoppel* claim where the plaintiff employee reported her supervisor's misconduct after she secured a promise from the senior manager that she would not suffer reprisal.[137] SDM's reply brief asserts that the central distinction in that case is that only non-sophisticated parties may rely on promises made by those with authority over them.[138] This assertion mischaracterizes the point.

In *Lord*, the plaintiff employee relied on the HR Director's authority to bind the defendant company to the promise not to seek reprisal against the plaintiff for reporting her manager's misbehavior.[139] Similarly, Dr. Breault was entitled to rely

---

[134] Opening Br. at 20.

[135] *Id.*

[136] Answer Br. at 33–34 (citing *Lord v. Peninsula United Methodist Homes, Inc.*, 2001 WL 392237 (Del. Super. Apr. 12, 2001)).

[137] *See Lord*, 2001 WL 392237, at *2–4.

[138] Reply Br. at 10.

[139] *Lord*, 2001 WL 392237, at *3 ("'[The HR Director] was reasonably viewed as an authority figure upon whom [plaintiff] could rely to insure that [the employer] would prevent [the

27

on K. Straine's representations. K. Straine is the CEO of SDM[140] and acted with at least apparent authority representing SDM. As such, the allegations are sufficient to suggest that Dr. Breault's reliance on K. Straine's alleged promises is reasonable.

SDM's reliance on *Grunstein v. Silva*[141] is misplaced. While that court ultimately denied a *promissory estoppel* claim after trial, the same claims had survived the motion to dismiss stage.[142]

Here, Dr. Breault alleges multiple facts supporting reasonable reliance: (1) he was actively held out to investors as CCO; (2) K. Straine repeatedly assured him the position would be formalized at closing; (3) even after the Second LOI's execution, K. Straine continued to assuage his concerns regarding the formalization of the CCO position.[143] Moreover, the parties lacked counsel during these oral communications, and Dr. Breault alleges he would not have considered transacting with SDM but for the CCO promise.[144]

---

supervisor] from making any reprisals against her'. . . . There is evidence that would allow a jury to find that [plaintiff] reasonably relied on [the HR Director]'s promise to her detriment.").

[140] Answer Br. at 1.

[141] Opening Br. at 19–20 (citing *Grunstein v. Silva*, 2014 WL 4473641 (Del. Ch. Sept. 5, 2014)).

[142] *Grunstein v. Silva*, 2009 WL 4698541, at *10 (Del. Ch. Dec. 8, 2009). "The fact that the Plaintiffs are not only sophisticated investors but also include an attorney at a major law firm . . . certainly undermines their reasonableness in relying on oral promises alone with respect to the equity distribution of a billion dollar deal. The Plaintiffs may have to confront these negative inferences later. The Complaint, however, facially alleges sufficient facts to justify reasonable reliance in this case—even among sophisticated parties—such that it would be improper to dismiss reliance-based claims at this stage." *Id.* at *12.

[143] Countercl. ¶¶ 11, 16, 21.

[144] *Id.* ¶ 10.

Drawing all reasonable inferences in Dr. Breault's favor, the Counterclaim pleads sufficient facts to establish both a definite and certain promise and reasonable reliance thereon. The detrimental reliance claim thus survives.

## V.    CONCLUSION

For the reasons set forth above, Counterclaim Defendant SDM's Motion to Dismiss is **DENIED.**

**IT IS SO ORDERED.**

/s/ Vivian L. Medinilla
Vivian L. Medinilla
Judge

cc: Prothonotary-Civil

29